United States Court of Appeals,

Fifth Circuit.

Nos. 92-4691A, 92-4691B and 92-4691C.

MERCHANTS FAST MOTOR LINES, INC. et al., National Motor Freight Traffic Association, Inc. et al., Texas Motor Transportation Association, Inc. et al., and Railroad Commission of Texas, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

NATIONAL MOTOR FREIGHT TRAFFIC ASSOCIATION, et al. and Texas Motor Transportation Association, et al., Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

Nov. 1, 1993.

Petition for Review of an Order of the Interstate Commerce Commission.

Before WISDOM and DAVIS, Circuit Judges, and SCHWARTZ[*], District Judge.

W. EUGENE DAVIS, Circuit Judge:

I.

In this consolidated appeal, three sets of petitioners seek review of three separate actions of the Interstate Commerce Commission (ICC). In 92-4691A and 92-4691C, petitioners seek review of a declaratory order[1] and a policy statement.[2] In these two actions, petitioners, including several trucking associations[3] and the Railroad Commission of Texas, challenge the ICC's determination that a particular type of transportation is in interstate commerce and therefore subject to ICC, rather than

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

[1]*Association of Texas Warehousemen et al.,* 8 I.C.C.2d 476 (No. 92-4691A) (1992) (*Warehousemen* ).

[2]*Policy Statement,* 8 I.C.C.2d 421 (No. 91-4691C) (1992) (*Policy Statement* ).

[3]National Motor Freight Traffic Association, Inc. et al. (NMFTA), Texas Motor Transportation Association, Inc. et al. (TMTA), and Merchants Fast Motor Lines, Inc., et al. (Merchants) join in the petition to review the declaratory order. NMFTA and TMTA join in the petition to review the policy statement.

state, regulation. The ICC takes the position in both the declaratory order and the policy statement that in certain circumstances when a shipper ships goods into Texas from another state, temporarily stores the goods at a warehouse in Texas, then later ships the goods to the shipper's Texas customer, the entire shipment is interstate in nature. Petitioners argue that the second leg of the transportation—from Texas warehouse to ultimate Texas destination—is an intrastate movement subject to state regulation. Because we do not find that the declaratory order is arbitrary or capricious, we deny the petitions to set aside this order. Because we find that the policy statement is not ripe for our review, we dismiss the petition in 92-4691A.

In 92-4691B, petitioners[4] seek review of another ICC declaratory order,[5] challenging only that portion of the order finding that an interstate movement to a warehouse by private carriage does not prevent a later, single-state movement from being treated as interstate commerce. Because petitioners TMTA and NMFTA can not establish standing and venue, respectively, we dismiss TMTA's petition for review and transfer NMFTA's petition to the D.C. Circuit.

II. Warehousemen declaratory order (92-4691A)

A.

In August 1991 the Association of Texas Warehousemen (Association) wrote the Railroad Commission of Texas (RCT) posing two questions: (1) whether the RCT considered the Texas leg of the transportation described above (from the warehouse to the customer) interstate or intrastate in nature; and (2) if intrastate, whether the RCT would seek to impose penalties or sanctions on parties not complying with RCT rates, rules, and orders. The RCT responded by letter, stating that an out-of-state shipment loses its interstate identity when it is consigned to a point in Texas "without further instructions for delivery to another Texas location." The RCT also stated that it could assess administrative penalties against carriers, shippers, and aiders and abettors, including warehousemen, for not complying with RCT rates, rules, and orders.

The Association then petitioned the ICC for a declaratory order declaring that the Texas leg

---

[4]NMFTA and TMTA join in this petition for review.

[5]*Pennsylvania-Johnstown-Altoona Express, Inc.,* 8 I.C.C.2d 815 (May 7, 1992) (*PJAX II* ).

of the transportation was interstate. By order served March 27, 1992, the ICC found that the risk

of imminent enforcement by the RCT presented a controversy sufficient to warrant the institution of

a § 554(e) declaratory proceeding. After the ICC requested and received numerous comments, it

issued its declaratory order. The ICC concluded that, in light of its own precedents and the

precedents of the federal courts, the transportation described in the Association's petition was in

interstate commerce.

The ICC's declaratory order described the transportation, on which its order is predicated, as

follows:

> ... Merchandise moves by for-hire carriage from points outside Texas to warehouse or
> distribution centers located in Texas. The shippers temporarily store the merchandise in
> Texas warehouses, and then ship the merchandise to Texas destinations by carriers with
> interstate authority. The exact ultimate Texas destinations may or may not be known at the
> time the shipments leave the out-of-State origins....
>
> [T]he shippers do not initially consign the shipment from an out-of-State origin to the
> ultimate Texas consignee, but rather to themselves in care of the Texas warehouses. The
> shipment is consigned to the ultimate consignee in the second leg of the transportation.... The
> two legs are separately billed....
>
> . . . . .
>
> ... Shipments are not made on through bills of lading and few, if any, storage-in-transit
> provisions are involved.... The warehouses receive no beneficial ownership interest in the
> goods.
>
> With increasingly sophisticated computer systems, little merchandise is being stored
> solely for inventory or stock. About 707 of the freight shipped to petitioners' warehouses is
> based on historic consumption patterns within Texas. About 257 of the freight is in response
> to customer orders, and 57 is inventory for smaller customers.[6]
>
> Some repackaging and reconfiguration (secondary packaging) is performed. The
> warehouses do not process or otherwise modify the original products. In general, the goods
> are held in storage at the Texas warehouse less than 45 days. Less than 17 remains in storage
> more than 365 days.
>
> Routing of the outbound shipment (the all-Texas portion) is usually handled by the
> warehouses, but the merchandise is always subject to the ultimate shipper's control and
> direction. The manner in which the freight charges are handled varies to some extent
> dependent upon whether less-than-truckload, truckload, or consolidated truckload traffic is
> involved.... [I]n all instances where the warehouse pays the freight charges, those charges are
> billed back to the warehouseman's customer [the shipper].

---

[6]The ICC order relates only to the shipments described as falling within the 707 figure. The
shipments made in response to direct orders (25%) are clearly interstate. The ICC did not rule on
the remaining 57.

The out-of-State shippers are willing, if necessary, to certify that they intend for their out-of-State origin shipments to move beyond the Texas warehouse point in a continuous interstate move....

[T]he intrastate traffic is identifiable and traceable.... less than 17 of the traffic is commingled....

8 I.C.C.2d at 478-81 & 490. (footnotes omitted). After the ICC issued its order, this petition for review followed.

B.

Petitioners argue first that the ICC's declaratory order is impermissibly broad. Quoting the dissenting opinion of Vice Chairman McDonald, petitioners point to the "generalized, global declaration of interstate jurisdiction" based on an "overly broad and vague record." *See* 8 I.C.C.2d 492. They argue that the order implicates an unknown multitude of shippers, carriers, products, and shipping patterns and that the breadth of the order therefore makes any determination of shipper intent impossible.

Congress commits to the sound discretion of the agency the decision whether to grant requested declaratory relief. 5 U.S.C. § 554(e);[7] *see also Intercity Transp. Co., No. 37476,* J.A. at 4 (Aug. 30, 1983) (ICC has broad statutory discretion to grant or decline declaratory relief), *aff'd, Intercity Transp. Co. v. United States,* 737 F.2d 103 (D.C.Cir.1984). Our inquiry is limited to whether the agency has abused its discretion. *Intercity,* 737 F.2d at 106-07. Section 554(e) authorizes an agency to issue declaratory relief to terminate a controversy or remove uncertainty. *See Central Freight Lines v. ICC,* 899 F.2d 413, 417 (5th Cir.1990).

The ICC found that the correspondence between the RCT and the Association evidenced an imminent threat of state prosecution. Over the years, the ICC has issued orders declaring single-state transportation out of storage to be interstate or intrastate, depending on the particular fact of each case. *See, e.g., Bigbee Transportation, Inc.,* No. MC-C-30065 (Nov. 1, 1988) (transportation found to be intrastate); *Armstrong, Inc.,* 2 I.C.C.2d 63 (1986) (transportation found to be interstate).

---

[7] (e) The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

5 U.S.C. § 554

Despite numerous ICC decisions, RCT continued to ignore the various factors the ICC considers important in determining the interstate nature of transportation. When questioned by the Association in August 1991, RCT took the narrow position that an out-of-state shipment loses its interstate identity when it arrives at a warehouse without further instructions. The ICC stated that it ordinarily might hesitate to institute such a broad scale proceeding, but that "RCT's consistent failure to consider any transportation pattern other than the limited one reiterated above requires additional action on our part to remove any lingering uncertainties as to what constitutes transportation in interstate commerce." *Warehousemen,* 8 I.C.C.2d at 486. The contested order applies to all shippers who can demonstrate that their shipping patterns match the general patterns assumed in the order. *See* 8 I.C.C.2d at 486.

We are persuaded that the ICC was reasonable and acted within its statutory authority in issuing its broad declaratory order. RCT had announced its intent to regulate all interstate shipments from Texas warehouses where the out-of-state shipper had not designated the final consignee. RCT's announced position was contrary to established ICC decisions that allowed shipper intent of a continuous, interstate shipment to be demonstrated by a variety of factors. This threat by RCT to regulate as intrastate commerce all shipments of this nature created a controversy and uncertainty among the parties about whether interstate or intrastate rates would apply to their shipments. A narrow order by the ICC would not have been helpful in resolving this controversy or removing this uncertainty created by the RCT regulation. We are persuaded that the order, when considered in light of the controversy, was not overbroad.

## C.

Petitioners next argue that the ICC was without jurisdiction to issue its order. The ICC has regulatory jurisdiction over for-hire motor carrier transportation in interstate commerce. 49 U.S.C. 10521(a)(1). States retain the authority to regulate wholly intrastate motor transportation. 49 U.S.C. 10521(b)(1). Petitioners argue that in regulating the Texas leg of the transportation, the ICC is trampling on the state's right to regulate intrastate commerce and is acting in excess of its statutory authority. Petitioners' argument is meritless. The ICC clearly has primary jurisdiction to determine,

in the first instance, whether challenged transportation is interstate.[8] *See Central Freight,* 899 F.2d at 417; *State of Texas v. United States,* 866 F.2d 1546, 1551-54 (5th Cir.1989). We next consider the merits of the ICC's order.

D.

In reviewing an ICC declaratory order, which we treat as an adjudicatory ruling,[9] this court may set aside the ICC's findings or conclusions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Central Freight,* 899 F.2d at 419. In this case we need only to consider whether the ICC's conclusions are rationally supported. *Central Freight,* 899 F.2d at 419.

The fundamental standards governing the nature of interstate transportation are clearly established. Whether transportation between two points in a single state is interstate or intrastate depends on the "essential character" of the shipment. *Texas & N.O.R.R. v. Sabine Tram Co.,* 227 U.S. 111, 122, 33 S.Ct. 229, 233, 57 L.Ed. 442 (1913); *Central Freight,* 899 F.2d at 419. The critical factor in determining the shipment's essential character is the fixed and persisting intent of the shipper at the time of the shipment. *Id.; Baltimore & O.S.W.R.R. Co. v. Settle,* 260 U.S. 166, 173-74, 43 S.Ct. 28, 31, 67 L.Ed. 189 (1922). The totality of the facts and circumstances will determine whether a shipper has the requisite intent to move goods continuously in interstate commerce. *Central Freight,* 899 F.2d at 419-20.

Petitioners argue first that the ICC's declaratory order is irreconcilable with controlling precedent. Specifically, petitioners argue that in previous decisions in which the ICC found a continuous interstate movement in circumstances similar to those presented in the contested order, the shipper had a manifest intent to move goods beyond the warehouse to an ultimate consignee. But

[8]The ICC's primary jurisdiction also defeats petitioners' argument that federalism concerns require the ICC to abstain from regulating the transportation in this case. The ICC purports only to regulate interstate transportation; this regulation is clearly encompassed within its statutory authority.

[9]Rendered in a specific factual context and resolving only those issues presented in petitioners' applications, declaratory rulings belong to the genre of adjudicatory rulings. *Texas,* 866 F.2d at 1555 (citing *Loveday v. FCC,* 707 F.2d 1443, 1447 (D.C.Cir.), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983)).

as stated above, "our task on review is to decide not whether we would construe the precedents as the ICC did, but whether the ICC's construction is reasonable and whether it has explained any departures from its past actions." *Central Freight,* 899 F.2d at 420-21 (citing *Texas,* 866 F.2d at 1556-57).

The ICC offers a number of explanations in support of its multi-factor approach. The ICC gave great weight to the fact that the shipper maintains control over the shipment from its out-of-state origin until it is delivered to the ultimate consignee. The ICC contends that the inclusion of this factor avoids conflict with *Atlantic Coast Line R.R. v. Standard Oil Co.,* 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927). In that case two shippers, rather than one, controlled the transportation. Also in that case, sellers from Louisiana and Mexico did not intend for their oil to move beyond the consignee's storage stations in Florida. *See id.* at 269, 48 S.Ct. at 111. The consignee or the second shipper controlled the in-state movement of the oil to its Florida customers.

Under the order the warehouses may act on behalf of the shipper in routing the all-Texas portion of the shipment without destroying the interstate nature of the shipment, so long as the routing is subject to the original shipper's control and direction.[10] To maintain the shipment as interstate the ICC assumed that the shippers intended to ship their goods to the final destination, not just to the warehouse. *See also The May Dep't Stores Co. and Volume Shoe Corp.,* MC-C-30146, at 7 (June 15, 1990) (continuity of interstate movement is not broken at warehouse when goods intended to move to ultimate destination).

The ICC also relied on the fact that "the shippers are constantly matching shipments and customers based on historic consumption and demand patterns." 8 I.C.C.2d at 490. The ICC found that the shipper's analysis of historic consumer needs enabled it to send goods to the warehouse with the expectation that the goods would soon move—usually within 45 days—to their ultimate destinations. The ICC reasonably concluded that the warehousemen in this circumstance are merely a link in the chain of interstate commerce.

---

[10]The ICC also states that the order does not apply to movements for which the ultimate consignee assumes any responsibility.

As stated above, the ICC's order lists numerous factors to be considered in their totality. Petitioners, on the other hand, isolate individual factors and cite cases involving a particular factor in an attempt to undermine the ICC's determination that the transportation is interstate. For example, petitioners argue that the in-state shipment from the warehouse is generally not considered interstate if the ultimate destination and ultimate consignee of each particular shipment is not known at the time of the original shipment. They cite *Central Freight* for the proposition that the ICC cannot rely on the mere "intent to distribute the merchandise at some future time" as evidence of shipper intent. See *Central Freight,* 899 F.2d at 422 (citing *Surles Contract Carrier Application,* 4 M.C.C. 488, 494 (1938)). Viewed in isolation and without the presence of any of the other factors on which the declaratory order is predicated, we agree with petitioners. But the factors listed in the ICC's order, bearing on shipper intent, must be considered in their totality.[11] *See id.* at 419-20. Petitioners' attempt to attack individual factors does not assist us in our analysis of whether the order is reasonable.

Petitioners also argue that essential factors that are necessary to a finding of shipper intent to ship goods in interstate commerce are missing from the order. Petitioners contend that a storage-in-transit provision must appear in the bill of lading to tie the two shipments together as a continuous interstate shipment. But we made it clear in Texas that this provision is just one of many factors that may bear on this question:

> [T]he ICC did not decide that the use of a storage-in-transit privilege was dispositive of the interstate nature of the movement. The ICC noted that it was a "strong indication" of the through character of the movement, but relied in addition on the "incidents" surrounding the involved transportation. Without discussing them in detail, the ICC noted such indicia as the tracking and documentation linking the shipments coming in and going out of Arlington, and the fact that the goods are not processed, other than being cut to specification, at the temporary storage point.

*Texas,* 866 F.2d at 1560-61 (footnotes omitted). We conclude that the ICC's multi-factor test is not arbitrary or unreasonable, even in the absence of a storage-in-transit provision.

---

[11]In response to petitioners' argument that the potential for commingling of interstate and intrastate traffic—noted in the Association's petition to be less than 1%—undermines the ICC's finding of shipper intent, the ICC argues that 17 should not disqualify the remaining 997 of the traffic from being treated as interstate. This factor as well, when considered along with all of the other factors in the ICC's order, does not render the ICC's conclusion unreasonable.

Petitioners also argue that the record does not support the following facts assumed by the ICC in its order: All of the shippers have computer-based inventory systems; the shippers use motor carriers with interstate operating authority for the shipments moving solely within Texas; only 17 of the goods is actually held in storage over one year; and the shippers actually exercise their right of control over the goods t hat are shipped within Texas from warehouse to customer. Petitioners misunderstand the nature of the ICC's order. The declaratory order simply "determine[s] the legal consequences of the factual predicate presented" by the warehousemen. *Texas,* 866 F.2d at 1551. The order would not insulate the warehousemen from a state regulatory proceeding if facts are presented which are different from those assumed in the declaratory order. *See Central Freight,* 899 F.2d at 418; *Texas,* 866 F.2d at 1551.

Next, petitioners point to the difficulties of applying the ICC's multi-factor test. They contend that the order does not demonstrate how shipper control is ever actually exercised over goods moving from warehouse to customer. They argue that the warehousemen actually serve as the second shipper. But the ICC admitted in oral argument that its declaratory order in *Warehousemen* does not resolve all future cases. For example, cases in which the parties dispute whether the shipper retains control over the goods during the second-leg of the shipment may need to be adjudicated. The order will resolve some disputes, others will be resolved in enforcement actions. The fact that the order does not resolve all cases does not render the ICC's finding of shipper control unreasonable.

Thus, in conducting a deferential review of the ICC's conclusions, we uphold as reasonable the ICC's application of its "fixed and persisting intent" rule based on a totality of the facts and circumstances. The fact that petitioners have made some persuasive arguments does not permit us to set aside the order. The ICC was not arbitrary or capricious in its determination that the essential character of the transportation presented by the Association was interstate.

Accordingly, the petitions in 92-4691A to review and set aside the ICC's declaratory order are DENIED.

III. Policy Statement (92-4691C)

A.

Petitioners RCT, TMTA, and NMFTA also have petitioned for review of the ICC's Policy Statement which summarizes factors the ICC uses to determine whether a shipment is in interstate or intrastate commerce. The policy statement applies to the same general factual pattern the ICC addressed in its declaratory order in *Warehousemen:* the goods are shipped to a Texas warehouse from another state and later transported to the shipper's customer inside the state. The ICC issued the policy statement, like the *Warehousemen* declaratory order, because of persisting challenges from state regulatory authorities to parties attempting to follow earlier ICC decisions. The policy statement consists of two lists of factors. The first list includes factors that demonstrate when in-state motor transportation is part of a continuing interstate movement.[12] The second list includes factors that, if present, do not automatically destroy the interstate nature of the movement.[13]

---

[12]Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. The factual basis for projecting customer demand may include, but is not limited to, historic sales in the State, actual present orders, relevant market surveys of need.

> No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed. This Commission and the U.S. Court of Appeals for the Fifth Circuit have found for example, that cutting carpeting from large rolls for further distribution constitutes repackaging or reconfiguring rather than product modification.

> While in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation.

> Modern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center.

> The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.

> The warehouse utilized is owned by the shipper.

> The shipments move through the warehouse pursuant to a storage in transit tariff provision.

8 I.C.C.2d 470, 473.

[13]The shipper's lack of knowledge of the specific, ultimate destination or consignee at the time the shipment leaves is out-of-State origin;

B.

First we consider whether the policy statement is ripe for review. Ripeness of the policy statement for review must be determined according to the test enunciated in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Generally, this requires us to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. Specifically, we must consider: (1) whether the issues presented are purely legal; (2) whether the agency's pronouncement is a "final agency action" within the meaning of 5 U.S.C. §§ 551(13) & 704;[14] (3) whether the impact on the petitioners is direct and immediate; and (4) whether resolution of the issues will foster effective administration of the statute. *Id.* at 149-54, 87 S.Ct. at 1515-18.

In applying *Abbott Laboratories,* we recognize that the policy statement satisfies prongs one and two of the Court's test so that the statement's "fitness for judicial decision" is not a barrier to our review. *See Baltimore Gas and Elec. Co. v. ICC,* 672 F.2d 146, 149 (D.C.Cir.1982). The statement's list of factors bearing on the character of interstate transportation presents issues that are

> Separate bills of lading for the inbound and outbound movements instead of through bills of lading;
>
> Storage-in-transit tariff provisions;
>
> Storage receipts issued by the warehouse distribution center;
>
> Time limitations on storage;
>
> Payment of transportation charges by warehouse or distribution center, when the shipper or consignee is ultimately billed for these charges;
>
> Routing of the outbound shipment by the warehouse or distribution center;
>
> A change in carriers or transportation modes at a distribution facility;
>
> Use of brokers retained by the shipper;
>
> Use of a warehouse not owned by the shipper.

8 I.C.C.2d 470, 474.

[14]5 U.S.C. § 704 provides that only final agency actions are subject to judicial review. 5 U.S.C. § 551(13) provides that an agency action includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof."

purely legal. Also, the fact that the policy statement was issued by the ICC's commissioners, was published, and was not labeled as tentative, lends support to the statement's finality. *See Abbott Laboratories,* 387 U.S. at 149-51, 87 S.Ct. at 1515-17.

The difficult question is whether the statement meets the third prong of the *Abbott Laboratories* test, i.e., does the policy statement have a direct, immediate impact on petitioners. See *Baltimore Gas,* 672 F.2d at 149. This aspect of the ripeness doctrine ensures that agencies are protected from judicial review until the effects of their action are felt in a "concrete way" by the challenging parties. *See Abbott Laboratories,* 387 U.S. at 148, 87 S.Ct. at 1515.

Petitioners contend that the policy statement affects them because the ICC is assigning it precedential value and using it as a basis for enforcement actions. But the factors listed in the policy statement are practically the same as the factors the ICC considered in its declaratory order in *Warehousemen.* The declaratory order notifies petitioners and others of essentially the same ICC policy towards regulation of this type of transportation as the policy statement. The declaratory order has been subjected to ordinary review. Petitioners have identified no hardship they will suffer from the policy statement that was not subject to review as part of the declaratory order. Our review of the declaratory order provides petitioners with an adequate forum for testing the policy statement in a concrete situation. *See Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 165, 87 S.Ct. 1520, 1525, 18 L.Ed.2d 697 (1967) (companion case to *Abbott Laboratories.*). We therefore have not refused petitioners' request to be relieved of an "onerous legal uncertainty." *See Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 128 (D.C.Cir.1974). And further review of these factors as listed in the policy statement would not foster the effective administration of the statute. *Abbott Laboratories,* 387 U.S. at 154.

We are not persuaded that petitioners will suffer hardship as a result of the ICC's issuance of the policy statement or that review of the policy statement will foster effective administration of the statute. Because the petitions in 92-4691C for review of the policy statement present an issue not ripe for judicial consideration, the petitions are DISMISSED.

IV. PJAX II declaratory order (92-4691B)

Petitioners NMFTA and TMTA petition for review of another ICC declaratory order holding that a wholly intrastate shipment could be tacked to an earlier interstate shipment in private carriage to make the entire shipment interstate in nature. Because we find that TMTA has no standing, we dismiss its petition for review. Because NMFTA is unable to establish venue in the Fifth Circuit, we transfer its petition to the D.C. Circuit.

A.

The motor carrier Pittsburgh-Johnstown-Altoona Express, Inc. (PJAX) initiated this declaratory proceeding to seek a determination that the movements it described were in interstate commerce. In ruling on the petition for declaratory order, the ICC found that a movement of goods in private carriage from out-of-state to a Pennsylvania warehouse may be tacked to a for-hire, in-state movement from warehouse to customer to create one continuous interstate movement.

Petitioners begin with the bedrock premise that private carriage, unlike for-hire carriage, is not regulated by either the ICC or the state. *See* 49 U.S.C. 10102(16). Petitioners contend that the ICC departed from its prior, well-established rulings that any portion of a shipment by private carriage should not be considered in determining the interstate nature of the transportation. "The transportation must be considered as beginning at the point where the shipper tenders his goods to a for-hire carrier. If delivery is then made at a point in the same State, the relevant transportation is not interstate transportation." *Motor Transportation of Property Within a Single State,* 94 M.C.C. 541, 550 (1964), *aff'd sub nom. Pennsylvania R.R. Co. v. United States,* 242 F.Supp. 890 (E.D.Pa.1965), *aff'd per curiam sub nom. American Trucking Ass'ns v. United States,* 382 U.S. 372, 86 S.Ct. 533, 15 L.Ed.2d 421 (1966). *See also Pennsylvania R.R. Co. v. Public Utils. Comm'n,* 298 U.S. 170, 56 S.Ct. 687, 80 L.Ed. 1130 (1936) (single-state movement by rail was not part of interstate transportation because preceding interstate movement by private rail carriage was not "transportation").

Petitioners, including NMFTA, filed a petition to reopen the proceeding in light of this court's Central Freight decision casting doubt on the ICC's new interpretation of its jurisdiction. *See Central Freight Lines v. ICC,* 899 F.2d 413, 425 (5th Cir.1990). The ICC denied this petition in

*Pennsylvania-Johnstown-Altoona Express, Inc.,* 8 I.C.C.2d 815 (1992) (*PJAX II* ). The petitioners now seek review of that portion of the ICC's order holding that the ICC gains jurisdiction over a for-hire, single-state movement by tacking it to a private carriage, interstate movement.

B.

First, we must determine whether the parties are properly before this court. The ICC argues that NMFTA, a party to the proceeding below, is unable to establish venue in the Fifth Circuit. Venue is proper in an agency review proceeding "in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit." 28 U.S.C. § 2343. The nationwide character of NMFTA's membership does not affect venue. *American Civil Liberties Union v. FCC,* 774 F.2d 24, 26 (1st Cir.1985) (*ACLU* ). Because NMFTA resides, or was incorporated in,[15] the District of Columbia and its principal office is in Virginia, the ICC requests that this petition be transferred to the D.C. or Fourth Circuit.

We have reviewed NMFTA's arguments in support of establishing venue in this circuit and find that none of them have merit. First, NMFTA asks us to exercise pendant venue over its petition because it arises out of a common nucleus of operative facts with other petitions for review before this court in which venue is proper. *See* 1A, Part 2 James W. Moore et al., *Moore's Federal Practice* 0.340(5) (2d ed. 1985). We decline the invitation. This petition challenges the ICC's decisions in *PJAX I* and *PJAX II* on the narrow question of whether an interstate movement in private carriage can be joined with an in-state movement to become transportation in interstate commerce. This narrow inquiry does not arise out of a common nucleus of facts with the other petitions before this court. *See Association of Texas Warehousemen,* 8 I.C.C.2d 476 (1992); *Policy Statement-Motor Carrier Interstate Transportation,* 8 I.C.C.2d 421 (1992). Rather, those petitions challenged the ICC's determination that certain factors are sufficient to demonstrate shipper intent to move goods beyond a Texas warehouse to a Texas customer in one continuous, interstate movement.

Next, NMFTA argues that its co-petitioner TMTA, a Texas entity, properly lodged its petition

---

[15]For venue purposes the residence of a corporate plaintiff, including a membership corporation, is the place of incorporation. *See American Newspaper Publishers Ass'ns v. U.S. Postal Serv.,* 789 F.2d 1090, 1092 (5th Cir.1986); *ACLU,* 774 F.2d at 26.

in this court. NMFTA contends that generally we may review petitions lacking proper venue so long as contemporaneous petitions for review are filed by parties who are able to establish venue. *See American Newspaper Publishers Ass'ns v. U.S. Postal Serv.,* 789 F.2d 1090, 1092 (5th Cir.1986). The question for resolution thus narrows to whether TMTA lodged a valid petition in this court.

The ICC argues that TMTA and its nominal co-petitioners have no standing to challenge the ICC's declaratory order because they are not "parties aggrieved" by the order. *See* 28 U.S.C. § 2344. Ordinarily, to qualify as a "party aggrieved," the entity must have participated in the underlying agency proceeding. *ACLU,* 774 F.2d at 25. Neither TMTA nor its co-petitioners participated in the agency proceeding.

TMTA attempts to avail itself of a narrow exception to this aggrieved party requirement. TMTA argues that although it was not a party to the original agency proceeding, it may appeal an agency decision if it attacks the decision as exceeding the agency's authority. *Wales Transp., Inc. v. ICC,* 728 F.2d 774, 776 n. 1 (5th Cir.1984) (citing *American Trucking Ass'ns, Inc. v. ICC,* 673 F.2d 82, 85 n. 4 (5th Cir.1982) (per curiam)). According to petitioners, this exception applies because they challenge the ICC's order in *PJAX II* as unlawfully expanding the ICC's jurisdiction to reach intrastate commerce, a power clearly reserved to the states by 49 U.S.C. § 10521(b). They argue that *Wales* gives them standing to make this argument. We therefore must determine whether the petitioners' attack qualifies under *Wales* as a challenge to the ICC's authority to issue the order.

*Texas v. United States,* 866 F.2d 1546 (5th Cir.1989) provides some insight into our inquiry. In that case Texas contended that the ICC lacked jurisdiction to issue a declaratory order pertaining to transportation that was facially intrastate, because the order had the effect of regulating intrastate commerce. We found that the ICC had primary jurisdiction to determine at the outset whether the transportation at issue was in interstate or intrastate commerce. *Id.* at 1553; *see also Service Storage & Transfer Co. v. Virginia,* 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959) (ICC has primary jurisdiction over scope of ICC certificates); *cf. Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 625-27, 93 S.Ct. 2469, 2481-82, 37 L.Ed.2d 207 (1973) (FDC has primary jurisdiction to determine its jurisdiction and may do so by declaratory order).

*Texas* therefore makes it clear that the ICC has authority to determine it own jurisdiction, i.e. whether the transportation at issue is interstate in character. *See Texas,* 866 F.2d at 1553. We are satisfied therefore that none of petitioners' claims qualify as an attack on the ICC's power to act. The *Wales* exception to the requirement that one seeking review must be an aggrieved party is exceedingly narrow. TMTA has not succeeded in demonstrating that it fits within this exception.[16] Thus, TMTA's petition must be dismissed for lack of standing.[17]

Because neither TMTA nor its nominal co-petitioners have a valid petition before this court, we conclude that it is in the interest of justice to transfer NMFTA's petition to a circuit court having proper venue. *See* 28 U.S.C. 1631; *Dornbusch v. Commissioner,* 860 F.2d 611, 612 (5th Cir.1988). Accordingly, we transfer NMFTA's petition to the District of Columbia Circuit, as it appears to be the most convenient circuit for both NMFTA and the ICC.

The petition by TMTA and its nominal co-petitioners in 92-4691B for review is DISMISSED and ICC's motion to transfer NMFTA's petition to the D.C. Circuit is GRANTED.

---

[16]At least one other circuit has refused to recognize the narrow exception we adopted in *Wales. See Matter of Chicago, Milwaukee, St. Paul and Pacific,* 799 F.2d 317, 335 (7th Cir.1986) (The "suggestion that non-parties may obtain review of orders that "exceed the power' of the agency is dubious." 28 U.S.C. § 2344, the Hobbs Act, "limits review to petitions filed by parties, and that is that.").

[17]Because we find that TMTA has failed to show how it has attacked the agency's decision as exceeding its authority, we need not determine whether TMTA has shown that the ICC's decision has subjected it to actual or threatened legal injury. *See American Trucking,* 673 F.2d 85 n. 4 (citing *Edward Hines Yellow Pine Trustee v. United States,* 263 U.S. 143, 147, 44 S.Ct. 72, 73, 68 L.Ed. 216 (1923)).