**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 96-40549
Summary Calendar
_____

AVELINO SILLER, JR., ET AL.,

Plaintiffs-Appellants,

VERSUS

L & F DISTRIBUTORS, LTD.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(B-94-CV-56)

_____

February 18, 1997

Before REYNALDO G. GARZA, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

This is an appeal from the granting of a summary judgment in favor of L&F Distributors ("L&F"), defendant-appellee, on an action for unpaid overtime wages pursuant to the Fair Labor Standards Act ("FLSA") 29 U.S.C. § 201, et seq. Plaintiffs-appellants are nineteen former and current long-haul truck drivers employed by L&F, a beer wholesaler of Anheuser-Busch ("AB") products operating exclusively in South Texas. Plaintiffs drove these products from

_____

[*] Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to this Rule, the Court has determined that this opinion should not be published.

the AB warehouse in Houston to L&F's warehouses in Harlingen, Alice, McAllen, and Laredo, Texas. They allege that they are entitled to overtime pay for all of their hours of driving in excess of 40 hours per week under the FLSA.

The FLSA requires employers to pay qualified employees engaged in commerce at a rate of time and a half for hours worked in excess of 40 in any week. 29 U.S.C. § 207(a)(1). L&F claims that it is exempt from the overtime requirements of the FLSA by virtue of 29 U.S.C. 213(b)(1). This particular section of the FLSA exempts employees with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service. According to the regulations promulgated by the FLSA, the Secretary of Transportation has power to establish qualifications and maximum hours of service if employees are: (1) employed by carriers whose transportation of property or passengers is subject to the Secretary of Transportation's jurisdiction under the Motor Carrier Act ("MCA"); and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways or passengers or property in interstate or foreign commerce withing the meaning of the MCA. 29 C.F.R. § 782.2(a). The magistrate judge to whom this case was referred granted summary judgment in favor of L&F and expressly held that the defendant was subject to the jurisdiction of the Secretary of Transportation and engaged in "interstate commerce." Thus, it was exempted from the overtime requirements of the FLSA. Both sides concede that the only issue on appeal is whether the

2

lower court was correct in finding that the plaintiffs were engaged in interstate commerce.

**Discussion**

To be subject to the Secretary of Transportation's jurisdiction pursuant to the MCA, a motor carrier must be engaged in interstate commerce. Although the MCA defines interstate commerce as commerce "between a place in a state and a place in another state," it has not been applied literally by the courts. In fact, we have defined it as the actual transport of goods across state lines or the intrastate transport of goods in the flow of interstate commerce. *Merchants Fast Motor Lines, Inc. v. I.C.C.,* 528 F.2d 1042, 1044 (5th Cir. 1976). More specifically, a "carrier is engaged in interstate commerce when transporting goods either originating in transit from beyond Texas or ultimately bound for destinations beyond Texas, even though the route of a particular carrier is wholly within one state. Traffic need not physically cross state lines to be in interstate commerce, if the goods carried are in the course of through transit." *Id. at 1044.*

In the present case, AB manufactured some of its products in its Houston facility and it imported some of its products from out-of-state facilities. Products brewed out-of-state were shipped to its Houston warehouse based on its' distributors', such as L&F's, sales projections. AB Houston ordered its products based on these projections under the assumption that these products would be shipped where needed. Once in the warehouse, regardless of whether it was manufactured in Houston or out-of-state, AB maintained a 6-

3

28 day inventory for purposes of "freshness." L&F entered the picture when it communicated with AB in determining the amount of beer needed by L&F warehouses. Once an amount was ascertained, L&F would send up its trucks to return "dunnage" (wooden pallets and cardboard separators used in shipping) from the last shipment and to pick up a new shipment of beer. Plaintiffs readily admit that approximately 39% of the truckloads driven by them contained some out-of-state products, while the other 61% consisted of beer entirely brewed in Houston.

Although all the beer transported by L&F was actually moved from one point in Texas to another point in Texas, a portion (up to 39%) of the beer began its journey in another state. This is the portion with which are concerned because even if the hauls contain only slight amounts of goods traveling in interstate commerce, they will be deemed interstate commerce in its entirety. *See Morris v. McComb,* 332 U.S. 422, 433 (1947); *Barefoot v. Mid-America Dairymen, Inc.*, 826 F.Supp. 1046, 1049 n.2 (N.D. Tex. 1993, *aff'd,* 16 F.3d 1216 (5th Cir. 1994).

All out-of-state beer delivered to the AB warehouse sat in the warehouse anywhere from 6 to 28 days. However, placing goods in a warehouse interrupts, but does not necessarily terminate the goods' interstate journey. *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 568 (1943). If the halt in goods is simply a convenient intermediate step in the process of delivering them to their final destination, they remain interstate commerce. *Id.* Yet, whether the transportation between two points in a single state is

4

interstate or intrastate depends on the shipment's "essential character." *Merchants Fast Motor Lines, Inc. v. I.C.C.,* 5 F.3d 911, 917 (5th Cir. 1993). Crucial to determining the shipment's essential character is the shipper's fixed and persisting intent at the time of shipment. *Id.* at 917.

The I.C.C. has developed a number of factors which are used to determine the shipper's intent in deciding whether the traffic remains interstate commerce on its in-state leg of the journey. However, we have held that the totality of all the facts and circumstances eventually determines whether a shipper has the requisite intent to move goods continuously in interstate commerce. *Texas v. United States,* 866 F.2d 1546, 1560 (5th Cir. 1989). Although there is no set formula in determining intent, we have used some of these factors as guides to establish the interstate or intrastate characteristic of a product. Some of the more relevant factors include: (1) whether a single shipper has control over both the inbound and outbound movements to and from the warehouse (*See Merchants Fast Motor Lines,* 5 F.3d at 915); (2) whether the shipments are made pursuant to specific orders or customer estimates of need which predict how much product will eventually be delivered to each customer (*Central Freight Lines v. I.C.C.,* 899 F.2d 413, 420; *See Merchants Fast Motor Lines,* 5 F.3d at 915); (3) how many customers the storage facility serves (*See Central Freight Lines,* 899 F.2d at 420); (4) how rapidly the product moves through the storage facility (*Central Freight Lines,* 899 F.2d at 420; *See Merchants Fast Motor Lines,* 5 F.3d at 915); (5) whether the

shipment is made pursuant to a storage-in-transit provision in an appropriate tariff (*Central Freight Lines,* 899 F.2d at 420); and (6) whether the product goes through additional processing or manufacture at the storage facility (*See Merchants Fast Motor Lines,* 5 F.3d at 915).

*T*his particular situation involved two separate carriers, AB and L&F. AB ordered products based on L&F's sales projections knowing that at least some of that beer would eventually reach South Texas. AB inaugurated the initial shipment of out-of-state beer to its Houston warehouse with a fixed and persisting intent that it would be shipped to South Texas and eventually customers. This intent was fixed at the shipment's origin and persisted as the shipment crossed state lines. This intent persevered as AB continued its products in motion after a brief (6-28 day) stop at its warehouse in Houston. Many of these products were not altered or modified at the Houston facility. Although AB did not ship its goods from Houston, it arranged with L&F, as it did with the 46 other warehouses it supplied in Texas, both the inbound "dunnage" and outbound products to be shipped from the AB warehouse down to its distributor in South Texas, L&F. Moreover, once on board L&F trucks, AB still maintained control over its' products. The goods remained subject to temperature and timeliness requirements, marketing methods and disposition of products, geographic sales area determinations, and decisions concerning what products would move where and when in L&F's territory. It performed these actions because it had an interest in making sure that its' products

6

reached South Texas in premium condition.

Essentially, we find that this was a case which involved a shipper whose intent was to move its products continuously from its out-of-state breweries to its in-state retailer-customers, via a distributor, with a temporary stop at its own warehouse to facilitate the interstate movement. Therefore, plaintiffs, as drivers for L&F, were engaged in interstate commerce.

AFFIRMED.