# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 31, 2024

Lyle W. Cayce
Clerk

No. 23-20494

———————————

Elizabeth Escobedo,

*Plaintiff—Appellee*,

*versus*

Ace Gathering, Incorporated,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-538

———————————————————————

Before Higginson, Willett, and Oldham, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

In this certified interlocutory appeal concerning unpaid overtime wages, we must decide whether tanker-truck drivers who transport crude oil solely within the State of Texas are transporting property in "interstate or foreign commerce" under the Motor Carrier Act of 1980. Because most of the crude oil being transported is ultimately bound for destinations outside the state, our precedent requires that we answer yes.

I

Ace Gathering, Inc. is in the business of "crude oil gathering," which Ace describes simply as "gathering crude oil from oil fields and transporting it to pipelines in order to fulfill contracts with Ace's customers." For transportation between the oil fields and pipelines, Ace employs so-called Crude Haulers. Crude Haulers are drivers of large, 18-wheeled tanker trucks who drive to producers' oil fields, load crude oil onto their trucks, and then transport that oil on public roads and highways to an "injection point" on a pipeline. Once injected, the oil travels through the pipeline to Ace's customers, who then receive their monthly contractual volume of oil at the pipeline terminal.

Everyone agrees that, as far as Ace's business is concerned, the entire process described above takes place solely within the State of Texas. There is, to be sure, evidence in the record that some of Ace's Crude Haulers occasionally drove across state lines and that these interstate routes were assigned on a volunteer basis. But all the Crude Haulers in this case attest that they never volunteered for such routes and that their driving duties never took them beyond state lines.

Everyone also agrees that once the crude oil reaches Ace's customers at the pipeline terminal, the oil is then taken either to out-of-state refineries (usually in Louisiana) or to export markets for shipment outside the United States. Granted, it is also clear from the record that not *all* the crude oil ultimately leaves the state. But some of Ace's executives submitted affidavits attesting that approximately 68% to 90% of the oil is later exported to foreign markets and that a "significant portion" of it is taken to out-of-state refineries.

Based on these undisputed facts, lead plaintiff Elizabeth Escobedo, along with a putative class of former Ace Crude Haulers, sued Ace for unpaid

overtime wages under the Fair Labor Standards Act (FLSA). The Crude Haulers collectively allege that they "regularly or occasionally worked in excess of forty hours a week" and that Ace misclassified them as exempt from FLSA overtime pay. After conducting discovery, Ace moved for summary judgment, arguing that the Motor Carrier Act (MCA) exempted the Crude Haulers from FLSA overtime pay. In response, the Crude Haulers disputed that one element of the MCA exemption—transportation in "interstate or foreign commerce"—had not been met and that they therefore qualify for FLSA overtime pay.

The district court initially denied Ace's motion, finding that Ace had no "vested interest" in the crude oil once it crossed state lines via pipeline and that Ace's volunteer-based interstate driving assignments created a genuine dispute of material fact with respect to whether the Crude Haulers had a reasonable expectation to drive across state lines. Upon a motion for reconsideration, however, the district court certified the following three questions for interlocutory appellate review under 28 U.S.C. § 1292(b):

1.  Does the transportation of crude oil, in and of itself, have a substantial impact on interstate commerce for the purposes of the Motor Carrier Act?

2.  Does the "vested interest" test apply to crude oil transportation? If so, whose interest may the court consider?

3.  Does a volunteer-based driving system create a reasonable expectation of interstate travel?

A panel of this court granted leave to file this interlocutory appeal, and we now review the certified questions *de novo*.[1]

---

[1] *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 526 (5th Cir. 2022).

## II

At the outset, we note that our "jurisdiction is not confined to the precise question[s] certified by the lower court."[2] It is instead delimited only by the particular order being appealed.[3] Here, that is the district court's order denying Ace summary judgment on the ground that the Crude Haulers were not transporting property in "interstate or foreign commerce" under the MCA. With the benefit of the parties' thorough briefing and the district court's reasoning below, we find that we can resolve that broader issue without the need to specifically answer any of the three certified questions.

## III

The MCA and the FLSA, which date back to the 1930s,[4] both regulate (among other things) the hours employees can work.[5] Congress deliberately sought to avoid any overlap between the two statutes, however, and to that end exempted from the FLSA any employee who was already regulated by the Interstate Commerce Commission pursuant its regulatory power under the MCA.[6] The same exemption still applies today, but the relevant statutory provisions now reflect the transfer of power from the now-defunct ICC to the Department of Transportation.[7] Thus, the FLSA's

---

[2] *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 363 (5th Cir. 2018).

[3] *United States v. Stanley*, 483 U.S. 669, 677 (1987).

[4] Pub. L. No. 74-255, 49 Stat. 543 (1935) (Motor Carrier Act); Pub. L. No. 75-718, 52 Stat. 1060 (1938) (Fair Labor Standards Act).

[5] *See* 49 U.S.C. § 31502; 29 U.S.C. § 207.

[6] *See* Pub. L. No. 75-676, 52 Stat. 1060, 1068, § 13(b) (1938) (exempting "any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carriers Act, 1935"); *see also Shew v. Southland Corp.*, 370 F.2d 376, 380 (5th Cir. 1966) ("There is no concurrent jurisdiction between the Fair Labor Standards Act and the Motor Carrier Act." (internal citation omitted)).

[7] *See* Pub. L. No. 89-670, 80 Stat. 931, 939–40, § 6(e)(6)(C) (1966) (codified at 49

overtime-pay provision does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the MCA.[8]

The two criteria for qualifying under the MCA exemption are set forth in 29 C.F.R. § 782.2(a): first, the employee must be "employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary of Transportation's] jurisdiction under section 204 of the Motor Carrier Act"; and second, the employee must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."

No one here disputes that the regulation's first requirement is met; nor does anyone dispute that the Crude Haulers were engaged in "safety-affecting activities" under the regulation's second requirement. The parties instead disagree, narrowly, on whether the Crude Haulers' transportation duties have triggered the second requirement's interstate- or foreign-commerce element.

The MCA defines interstate commerce as, simply, transportation "between a place in a State and a place in another State."[9] Our precedent construing this definition, however, has not been so simple. As we observed a little over a decade ago, the MCA's definition of interstate commerce "has

U.S.C. § 31502(b)) (transferring to the Secretary of Transportation "all functions, powers, and duties of the Interstate Commerce Commission" related to promulgating "qualifications and maximum hours of service of employees" subject to the Motor Carrier Act).

[8] 29 U.S.C. § 213(b)(1).

[9] 49 U.S.C. § 13501(a).

not been applied literally by the courts."[10] We have instead applied the MCA exemption not only to "the actual transport of goods across state lines," as its definition plainly suggests, but also to "the *intrastate* transport of goods in the flow of interstate commerce."[11]

This more capacious understanding of interstate commerce has, perhaps unsurprisingly, precipitated line-drawing problems and, alas, various multifactor balancing tests. At bottom, however, we have long recognized the "elemental" principle that "a carrier is engaged in interstate commerce when transporting goods . . . *ultimately bound* for destinations beyond Texas, even though the route of the particular carrier is wholly within one state."[12] Indeed, so long as "goods carried are in the course of through transit" to another state, we have observed, "[t]raffic need not physically cross state lines to be in interstate commerce."[13]

Cases from both our court and the Supreme Court illustrate how this principle works in practice. In *Shew v. Southland Corp.*, for example, we held that drivers for a dairy business, who delivered dairy products between Dallas and Midland, engaged in interstate commerce under the MCA because the products they were transporting originated outside the state.[14] "Though the transportation by Southland from Dallas to points in Texas is between points in the same state," we reasoned, "these shipments originate out of the state and are part of a continuous movement in interstate commerce."[15] Similarly,

---

[10] *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010) (citation omitted).

[11] *Id.* at 472 (emphasis added) (citing *Merchants Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976)).

[12] *Merchants Fast Motor Lines*, 528 F.2d at 1044 (emphasis added).

[13] *Id.*

[14] 370 F.2d at 380.

[15] *Id.*

in *United States v. Capital Transit Co.*, the Supreme Court held that a D.C. bus company's transportation of passengers solely within D.C. qualified as interstate commerce because its passengers were ultimately bound for Virginia.[16] The bus company's "intra-District streetcar and bus transportation of passengers going to and from Virginia establishments," the Supreme Court held, "is an integral part of an interstate movement."[17]

The same line of reasoning from these cases can, in our view, be straightforwardly applied to this case. It is undisputed that the crude oil Ace ships to its customers is often bound for out-of-state locations. Ace's customers either trade the crude oil on the export market for transport to other countries or refine the crude oil in refineries in other states, like Louisiana. So while the Crude Haulers' transportation of the crude oil is indeed entirely intrastate, their transportation is but one segment of the crude oil's larger interstate journey[18] and, by all indications, part of the crude oil's "practical continuity of movement"[19] out of the state. Thus, under controlling precedent, we tread no new ground in holding that purely intrastate transportation rises to the level of interstate commerce when the product is ultimately bound for out-of-state destinations, just as the crude oil was here.

IV

The Crude Haulers, for their part, not only failed to rebut Ace's summary-judgment evidence on this point, but also do not offer any

---

[16] 338 U.S. 286, 290 (1949).

[17] *Id.*

[18] *Cf. Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 219–20 (2d Cir. 2002) (purely intrastate transportation was interstate commerce because the "carriage was merely one leg of a route to an out-of-state destination").

[19] *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 569 (1943).

meaningful response to Ace's argument that their transportation of crude oil constitutes "the intrastate transport of goods in the flow of interstate commerce."[20] Instead, according to the Crude Haulers, the only relevant question we need ask is whether Ace had a "fixed and persisting intent" to ship the crude oil across state lines.

The fixed-and-persisting-intent test derives, as far as we can tell, from *Baltimore & O.S.W.R. Co. v. Settle*, in which the Supreme Court rejected an interstate shipper's contention that its commerce was purely intrastate because its segmented shipments "came to rest" at multiple local destinations.[21] Crucially, in that context, the Court found it necessary to holistically evaluate the "intention with which the shipment was made" in order to determine whether the shipment was interstate in character."[22]

Since *Settle* and other similar cases,[23] we have consistently applied the fixed-and-persisting-intent test only to those cases in which the product being shipped was stored in a warehouse or other facility during its interstate journey.[24] Granted, when we occasionally recited the test, we did so broadly,

---

[20] *Siller v. L & F Distributors, Ltd.*, 109 F.3d 765, at *1 (5th Cir. 1997).

[21] 260 U.S. 166, 169 (1922).

[22] *Id.* at 170.

[23] *E.g.*, *Texas & N.O.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 122 (1913) (evaluating the "essential character" of the shipment for a company that had completed one intrastate leg of interstate transportation).

[24] *E.g.*, *Siller*, 109 F.3d at *2 (discussing the shipper's intent when the shipment "sat in a warehouse anywhere from 6 to 28 days"); *Central Freight Lines v. ICC*, 899 F.2d 413, 420 (5th Cir. 1990) (discussing the shipper's intent when the shipments came to rest at "Texas storage terminals"); *Texas v. United States*, 866 F.2d 1546, 1549, 1560–61 (5th Cir. 1989) (discussing the shipper's intent when the shipments "s[at] in the Arlington warehouse"); *Merchants Fast Motor Lines, Inc. v. I.C.C.*, 5 F.3d 911, 917–18 (5th Cir. 1993) (discussing the shipper's intent when the shipment stopped at a warehouse); *Texas v. Anderson, Clayton & Co.*, 92 F.2d 104, 107 (5th Cir. 1937) (discussing the shipper's intent when "the shipment comes to rest within the state of origin and the goods are thereafter

not expressly indicating that it was reserved for a particular category of cases.[25] But a close reading of our precedent and the Supreme Court's reveals that ascertaining the shipper's intent is necessary only because a product can "come to rest" at a storage facility and thus end its interstate journey.[26] Confirming this understanding are cases from our sister circuits,[27] interpretative guidance offered by both the Department of Labor and the Interstate Commerce Commission,[28] and the demonstrable irrelevance of the

---

disposed of locally").

[25] *See, e.g.*, *Texas*, 866 F.2d at 1556 ("It is well settled that characterization of transportation between two points in a State as interstate or intrastate in nature depends on the essential character of the shipment. Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment." (internal quotation and emphases removed)).

[26] *See, e.g.*, *Walling*, 317 U.S. at 568 ("The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey."); *see also supra*, notes 24 and 25.

[27] *E.g.*, *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1154–56 (10th Cir. 2016) ("For certain types of shipments, the interstate nature of the transportation can become blurred as products are temporarily warehoused or moved by various carriers—some of whom may only complete intrastate portions of the journey."); *Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410–12 (6th Cir. 1970) (determining whether a product has "come to rest" at a storage facility by asking whether the shipper had a "fixed and persisting intent" to move the products beyond the storage facility); *Kennedy v. Equity Transp. Co.*, 663 F. App'x 38, 40 (2d Cir. 2016) (explaining that a shipper's intent is relevant only to the extent products are warehoused along their interstate journey).

[28] *See* 29 C.F.R. § 782.7(b)(2) (discussing fixed and persisting intent for "transportation confined to points in a single State from a storage terminal of commodities which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State . . . ."); 8 I.C.C.2d 470, 471 ("If the merchandise comes to rest in a manner sufficient to break the continuity of the original interstate commerce, then subsequent transportation within the State by for-hire carriers may constitute transportation in intrastate commerce subject to applicable State regulation. The essential and controlling element in determining whether the traffic is properly characterized as interstate is whether the shipper has a 'fixed and persisting intent' to have the shipment continue in interstate commerce to its ultimate destination.").

many factors we would ordinarily use for our inquiry into intent.[29]

There is no allegation in this case that Ace's oil was temporarily stored during any part of its interstate journey, at least while it was under Ace's control. The Crude Haulers, to be sure, suggest in a footnote that the crude oil was "stored" in the pipeline. But they do not cite anything in the record for that doubtful assertion, and we see no evidence otherwise indicating that the oil's "storage" in the pipeline interrupted its movement to customers. Indeed, if anything, the pipeline facilitated the crude oil's continuous movement from the injection point to the terminal. We therefore decline the Crude Haulers' invitation to determine whether Ace (which we will assume is a shipper, for the sake of argument) had a fixed and persisting intent to ship the crude oil out of the state.

V

In sum, we hold that the Crude Haulers transport property "in interstate or foreign commerce within the meaning of the Motor Carrier Act."[30] We accordingly REVERSE the district court's denial of summary judgment and REMAND with instructions to dismiss the plaintiffs' claims with prejudice.

---

[29] *See Siller*, 109 F.3d at *2 (looking to factors such as "whether a single shipper has control over both the inbound and outbound movements to and from the warehouse," "how many customers the storage facility serves," "how rapidly the product moves through the storage facility," "whether the shipment is made pursuant to a storage-in-transit provision in an appropriate tariff," and "whether the product goes through additional processing or manufacture at the storage facility").

[30] 29 C.F.R. § 782.2(a).

Andrew S. Oldham, *Circuit Judge*, concurring in the judgment:

I have no reason to doubt the way my esteemed colleagues applied the Department of Labor's interpretive rule and our precedents. I write separately, however, to emphasize the confusion surrounding this area of law.

In 1971, the Department of Labor ("DOL") issued an interpretive rule exempting certain employees from federal overtime requirements. *See* 29 C.F.R. § 782.0; *cf.* 29 U.S.C. § 213(b)(1). That rule provides that exempt employees must, among other things, "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in *interstate or foreign commerce within the meaning of the Motor Carrier Act*." *See* 29 C.F.R. § 782.2(a)(2) (emphasis added). The Motor Carrier Act of 1935 established federal regulatory authority over motor carriers engaged in such commerce. *See* Pub. L. No. 74-255, § 202(b), 49 Stat. 543, 543 (1935). In doing so, the Act narrowly defined both forms of commerce. *See id.* § 203(a)(10) ("'[I]nterstate commerce' means commerce between any place in a State and any place in another State or between places in the same State through another State . . . ."); *id.* § 203(a)(11) ("'[F]oreign commerce' means commerce between any place in the United States and any place in a foreign country, or between places in the United States through any foreign country . . . ."). Based on those texts, you might reasonably think that the DOL interpretive rule exempted from overtime only those employees who *actually* crossed state or national borders in the course of their commercial activities—and *not* those whose intrastate activities might substantially affect interstate commerce under *Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942).

Alas, it is not that simple. In 1978, and again in 1995, Congress changed the statutory provisions regarding motor carrier regulation. *See* Pub. L. No. 95-473, 92 Stat. 1337, 1361–62 (1978); Pub. L. No. 104-88, 109 Stat.

803, 859 (1995). As a result, federal authority no longer turned on whether motor carriers operated in "interstate or foreign commerce" as those terms are defined in the Motor Carrier Act. *See, e.g.*, 92 Stat. 1337, 1338, 1361–62 (asserting authority over motor carriers that cross state or national borders, or engage in transportation in reservations or on public roads); 49 U.S.C. §§ 13501, 13102(14) & (15) (West 2024) (same). Does DOL think it is still operating under the old, more-limited definition of interstate commerce embraced in the Motor Carrier Act? Or does DOL think the overtime exemption now reaches any employee whose intrastate activities substantially affect interstate commerce? Unclear. All we know is that DOL appears to have not changed its interpretive rule since 1971.

Adding confusion to incoherence, our precedents applying the 1971 rule say virtually nothing about its text. *See, e.g.*, *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010) (noting that the Motor Carrier Act's definition of interstate commerce "has not been applied literally by the courts" (citing *Siller v. L & F Distribs., Ltd.*, 109 F.3d 765, at *1 (5th Cir. 1997))). We have instead devised multiple, unmanageable standards for making overtime decisions. *See, e.g.*, *Merchs. Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976) (asking whether a good is "ultimately bound" for out-of-State destinations); *Merchs. Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 917 (5th Cir. 1993) (asking whether "the fixed and persisting intent of the shipper" implicates interstate commerce). Moreover, we have developed an eight-factor balancing test to assess whether a class of employees has a "reasonable expectation" of interstate transportation. *See Olibas v. Barclay*, 838 F.3d 442, 449 n.11 (5th Cir. 2016) (asking "(1) whether all employees in the class have similar job duties, even if only some employees in the class make interstate trips; (2) whether the employer regularly sends some drivers to interstate destinations; (3) whether the employer requires its drivers to meet DOT requirements; (4) whether and with what frequency project

assignments are subject to change; (5) whether the drivers' assignments are given via dispatch based on customer need; (6) whether drivers have fixed or dedicated routes; (7) whether assignments are distributed indiscriminately; and (8) whether drivers risk termination for refusing trips from dispatch"). Of course, no factor is necessary, and none is dispositive. *See ibid.*

It is unclear how we are supposed to apply any of this given binding instructions—from both the Supreme Court and our en banc court—that text is king when it comes to overtime rules. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–90 (2018); *Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 293–96 (5th Cir. 2021) (en banc), *affirmed*, 598 U.S. 39, 49–59 (2023). It is unclear how the 1971 rule comports with the text of the relevant statutes. And it is unclear how our precedents comport with the 1971 rule, which says nothing about factors like the good's ultimate destination or the shipper's state of mind.

Incoherent as they might be, the precedents bind us. So I concur in the judgment.

13