NATIONAL PROPANE GAS
ASSOCIATION, et al.,
Plaintiffs,

v.

The UNITED STATES DEPARTMENT
OF TRANSPORTATION, et al.,
Defendants.

No. Civ.A. 3:97–CV–2576–D.

United States District Court,
N.D. Texas,
Dallas Division.

March 17, 1999.

Eric A. Kuwana, Patton Boggs, Washington, DC, David Patrick Long, Kevin D. Green, Judith W. Bagley, Patton Boggs, Dallas, TX, for plaintiffs.

Sandra M. Schraibman, Sylvia T. Kaser, U.S. Department of Justice, Civil Division, Washington, DC, Nancy E. Machado, U.S. Department of Transportation, Research and Special Programs, Washington, DC, James P. Laurence, Ass't U.S. Atty., Dallas, TX, for defendants.

FITZWATER, District Judge.

This is a suit to stay the effectiveness of, and to enjoin defendants from enforcing, a

final rule of the Research and Special Programs Administration ("RSPA") of the United States Department of Transportation ("DOT") entitled, "Hazardous Materials: Cargo Tank Motor Vehicles in Liquefied Compressed Gas Service," codified at 49 C.F.R. § 171.5(a)(1)(iii) (1997) (the "Final Rule"), and defendants' interpretation of another regulation, 49 C.F.R. § 177.834(i) (1997) (the "Attendance Regulation"). Plaintiffs allege various violations of the Administrative Procedure Act, 5 U.S.C. § 551 *et. seq.* ("APA"), and the Regulatory Flexibility Act, 5 U.S.C. §§ 601–612 ("RFA"). The court upholds the Final Rule and defendants' interpretation of the Attendance Rule.

I

A

Liquefied compressed gases, including propane, are delivered by cargo tank motor vehicles.[1] These vehicles are classified by DOT as specification MC 331 large highway transport tank vehicles and specification MC 330 small local delivery vehicles (bobtail trucks).[2] Large vehicles deliver propane primarily to bulk storage and industrial facilities; small vehicles, by contrast, distribute propane chiefly to consumer-size tanks at houses, farms, and other smaller-volume users. These vehicles are regulated by Hazardous Material Regulations ("HMR"), codified at 49 C.F.R. pts. 171–180, first issued by the Interstate Commerce Commission in 1941, and periodically modified thereafter by RSPA. RSPA or its predecessor promulgated the HMR under authority delegated from the Secretary of Transportation (the "Secretary"), *see* 49 C.F.R. § 1.53 (1998), whom Congress authorized by statute to promote public safety by regulating the transportation of hazardous materials.

Among the HMR safety provisions is the emergency discharge control regulation. 49 C.F.R. § 178.337–11(a) (1997). This rule requires that cargo tank motor vehicle product discharge openings be protected with an excess flow valve or an internal self-closing stop valve, either of which must automatically close if any tank attachment is sheared off or any attached hoses or piping are separated. 49 C.F.R. §§ 178.337–11(a)(1)(i) & 178.337–8(a)(2) (1997). The mandatory use of emergency discharge control systems is intended to mitigate large-scale releases of hazardous materials that could result in personal injury and property destruction. The HMR also include the Attendance Regulation. 49 C.F.R. § 177.834(i). This rule mandates operator attendance during unloading operations, thereby ensuring that operator-dependent emergency countermeasures can be taken in the event of partial hose or piping rupture, separation, or leak.

In 1997 RSPA adopted the Final Rule in response to what it concluded were serious threats to public safety caused by noncompliance with the requirements of § 178.337–11(a) and the attendance requirements of § 177.834(i)(3).

B

The investigation of a September 8, 1996 incident in Sanford, North Carolina—which revealed widespread industry noncompliance with the HMR—in principal part prompted the rulemaking process at issue in this case. In the Sanford accident more than 35,000 gallons of propane were released during a delivery by a specification MC 331 cargo tank motor vehicle at a bulk storage facility. This mishap occurred when the discharge hose from the cargo tank separated at its hose coupling at the storage tank inlet connection, resulting in the release of most of the vehicle's

---

1. Other liquefied compressed gases commonly transported by cargo tank motor vehicles are anhydrous ammonia and chlorine.

2. There are also non-specification cargo tank motor vehicles that are authorized to transport liquefied petroleum gas. *See* 49 C.F.R. § 173.315(k) (1997).

9,800 gallons and more than 30,000 gallons from the storage tanks. According to RSPA, when the driver became aware of the system failure he immediately shut down the engine, which in turn stopped the discharge pump, but he could not access the remote closure control to close the internal stop valve. The emergency discharge control system's excess flow feature did not function and propane continued to be released. The back flow check valve on the storage tank did not function, resulting in the additional release of propane from the storage tanks.

Based on preliminary information from Sanford, RSPA published on December 13, 1996 an advisory notice in the *Federal Register*, alerting persons involved in the design, manufacture, or use of specification MC 330 and MC 331 cargo tank motor vehicles of the problem with the excess flow feature, and reminding them that these tanks and their components must conform to the HMR. *See* 61 Fed.Reg. 65480 (1996). In response to the notice, plaintiff National Propane Gas Association ("NPGA") and Mississippi Tank Company ("MTC"), a manufacturer of specification MC 331 cargo tank motor vehicles, submitted emergency exemption applications from the HMR.[3] These requests led RSPA to find that the problem concerning failure of the excess flow feature with the emergency discharge control systems was more extensive than originally believed. For example, MTC provided preliminary information in support of its exemption application that prompted RSPA to conclude "that there is reason to suspect the problem may be common to nearly all cargo tank motor vehicles used in liquefied compressed gas service within the United States" and that the problem may also exist in non-specification cargo tanks. 62 Fed.Reg. 7638, 7639 (1997).

Based on the emergency exemption applications, discussions with the applicants, information developed by the Federal Highway Administration ("FHWA") investigation of the Sanford incident, the regulatory history related to the issues, and knowledge of the liquefied compressed gas industry, RSPA and FHWA developed certain information and opinions related to the failure of the excess flow feature with the emergency discharge control system on cargo tanks used to transport liquefied compressed gases. They found that emergency discharge control systems on cargo tanks that transport liquefied gases incorporate as their two basic safety features (1) an excess flow feature designed to stop the flow of gas automatically when piping, fittings, or hoses rupture or separate, and (2) a remotely controlled internal self-closing stop valve. RSPA concluded that most specification MC 330 and MC 331 cargo tank motor vehicles are fitted with an internal self-closing stop valve that incorporates an excess flow feature. Section 178.337–11(a)(1)(i) does not mandate that an internal self-closing stop valve have an excess flow feature. It requires instead that the discharge valve automatically close if any one of its attachments is sheared off or if any attached hoses or piping is separated. Equipment such as a system that measures a differential in pressure, a pressure drop, or a hose or piping separation, and automatically closes the internal self-closing stop valve on the cargo tank and stops product discharge in case of separation or rupture of a hose or piping, may be used to meet the emergency discharge control system performance requirement specified in § 178.337–11(a)(1)(i).

After evaluating the circumstances that the NPGA and MTC emergency exemption applications presented, RSPA found that there was an emergency that applied broadly to many persons and that had far-reaching safety and economic conse-

---

**3.** The Fertilizer Institute and National Tank Truck Carriers, Inc. submitted applications to join the requested exemptions.

quences.[4] RSPA concluded that the long-standing requirements of the HMR neither were well understood nor complied with fully. The evaluation of the Sanford incident revealed that the HMR-mandated level of safety was not being achieved on equipment currently produced and certified by cargo tank manufacturers. The tanks did not comply with the requirement for automatic closure of internal self-closing stop valves and excess flow valves in the event of hose or piping separation. Industry had attempted to increase efficiency in unloading hazardous materials by installing pumps on specification MC 330 and MC 331 cargo tank motor vehicles. While increasing product transfer speed, these pumps prevented emergency discharge control systems from operating properly under all temperatures and pressures routinely encountered during normal transportation conditions.

RSPA also determined that, besides installing pumps, industry had introduced internal self-closing stop valves with an emergency feature designed to function at flow rates well above the discharge capacity of the pump. This effectively assured uninterrupted product transfer by eliminating inadvertent functioning of the emergency discharge control system. Consequently, in most product discharge system configurations, the pump functioned as a regulator in the product discharge line to eradicate any potential for the emergency discharge control system to function in case of a line separation. RSPA noted that it was unaware of readily available off-the-shelf equipment capable of providing a functioning automatic excess flow feature on cargo tanks without removal of pumps and other restrictions. RSPA also concluded that NPGA bulletins issued in 1978 and 1990 demonstrated that the industry had been aware since at least 1978 that excess flow valves were not designed to function where piping system restrictions, such as pumps, decreased the

flow rate to less than the excess flow valve's closing flow, rendering the emergency discharge control systems ineffective.

RSPA also pointed out that although concerns had been expressed for decades concerning controlling the unintended release of hazardous materials, the September 1996 Sanford incident spurred renewed attention to the dangers of transporting and delivering propane. Because the transfer of hazardous materials to and from cargo tank motor vehicles posed a significant threat to life and property, the HMR placed special emphasis on emergency discharge controls, including the requirements for excess flow valves and internal self-closing stop valves that close automatically upon line separation. The HMR also required a mechanical and/or thermal means of activating the internal self-closing stop valve. RSPA concluded that the effectiveness of safety appliances in safeguarding life and property at the critical moment of an unintentional release of extremely hazardous materials was well demonstrated and widely recognized. Emergency discharge control requirements for certain cargo tank motor vehicles transporting liquefied compressed gases had been in place since 1941. Despite slight modifications in ensuing years, the essential elements of the regulations concerning excess flow valves and internal self-closing stop valves had remained unchanged. The provisions in the regulations for secondary remote controls and fusible links that cause the internal valve to close automatically in case a cargo tank is involved in a fire shared the same essential elements as those originally ordered 50 years before.

RSPA and FHWA opined that manual activation by the vehicle operator of the internal self-closing stop valve was the primary means of stopping the flow of product from a cargo tank motor vehicle in the

4. RSPA also cited eleven major incidents during the period of 1962 to 1997 to demonstrate

the potentially grave consequences presented when liquefied petroleum gases are released.

event of pipe, fitting, or hose failure during transfer operations. They also concluded that tanks with capacities greater than 3,500 gallons must have remote means (both mechanical and thermal) of automatically closing the internal self-closing stop valve,[5] and that the remote operators must be installed at the ends of the tank in at least two, diagonally opposite locations. Cargo tanks with capacities of 3,500 gallons or fewer must have at least one remote means of closure (which may be mechanical) installed on the end of the tank farther away from the loading/unloading connection area.

Based on the conclusions that manual activation by the vehicle operator is the primary means of stopping product flow, and that the excess flow feature of the emergency discharge control system may not function on current systems, RSPA and FHWA found that special operator attendance requirements were necessary to ensure that a qualified person would always be in a position immediately to activate the internal stop valve in case of a release. In addition to the existing requirements of the Attendance Regulation, they determined that the operator must have an unobstructed view of the cargo delivery lines and be within an arm's reach of a means for closing the internal self-closing stop valve or other device that would stop the discharge of product from the cargo tank. They conceded that until an automatic flow control system was developed, this might require two operator attendants or use of a lanyard, electromechanical, or other device or system to stop product flow remotely. RSPA and FHWA also detailed several other measures that could be taken to mitigate the type of problem experienced at Sanford.

C

To address the foregoing concerns and to enhance the safety of product transfer operations while permitting the continued delivery of liquefied compressed gases, RSPA promulgated on February 19, 1997 an emergency interim final rule ("IFR"), 62 Fed.Reg. 7638,[6] that adopted new 49 C.F.R. § 171.5(a)(1)(iii). Under specific conditions, the IFR authorized the continued manufacture, assembly, certification, use, and recertification of cargo tanks that might not meet the excess flow feature requirements for cargo tanks authorized for transportation of liquefied compressed gases. RSPA and FHWA concluded that without the authorization for continued operation that the IFR provided, the public, industry, cargo tank motor vehicle operators, and manufacturers would be severely impacted. The IFR permitted the continued highway transportation of liquefied compressed gases used for home heating, support of industrial and agricultural operations, and fertilizer. Because there were no alternative means for product distribution in most areas served by cargo tank motor vehicles, RSPA and FHWA concluded that the IFR was necessary to prevent severe product shortages and the resulting safety and economic consequences from such deficiencies.

RSPA made the IFR effective through August 15, 1997, a date that fell between the end of the 1997 planting season and the beginning of the winter 1997–98 heating season, to provide industry the necessary time to bring cargo tanks into compliance with the pre-IFR regulatory requirements (*i.e.*, the HMR). RSPA intended that this interval would allow adequate time for implementation of equipment changes that would automatically shut down product transfer, as required by § 178.337–11 when a pipe or hose

---

**5.** The HMR required that the excess flow feature function if there was a complete separation of any attached hoses or piping. They did not mandate that it function in response to leaks or partial failures of pipes, fittings, or hoses.

**6.** Plaintiffs do not challenge the IFR. *See* Compl. at 4, ¶ 8.

ruptured or separated. During that period, RSPA and FHWA would actively pursue technical improvements to product delivery systems and other feasible operational controls to minimize threats to public safety from the transportation of liquefied compressed gases. They also noted that this phase would enable industry to demonstrate, if it could, that regulatory compliance is not feasible, and recommend timetables for achieving compliance or implementing alternative technology to achieve the safety objective of a passive automatic shut off system for emergency discharge control.

RSPA and FHWA also stated that as of the expiration of the IFR, they could announce their intention strictly to enforce the current HMR absent industry evidence of good faith efforts to develop a properly operating system that met the HMR requirements. Alternatively, they advised that RSPA would implement rulemaking either to modify the current regulatory requirement, provide a different means of passive shut-off, or extend the IFR's provisions (with any warranted modifications).

On August 16, 1997 RSPA adopted the IFR, as modified, as a final rule. *See* 62 Fed.Reg. 44038 (1997). In response to petitions for reconsideration, RSPA modified the Final Rule on December 10, 1997. *See* 62 Fed.Reg. 65188 (1997). In its final form, the challenged portion of the Final Rule requires:

If there is an unintentional release of lading to the environment during transfer, the internal self-closing stop valve shall be promptly activated, and the qualified person unloading the cargo tank motor vehicle shall promptly shut down all motive and auxiliary power equipment. Prompt activation of the internal self-closing stop valve may be accomplished through:

(A) Compliance with § 178.337–11(a)(1)(i) of this subchapter; or

(B) A qualified person positioned within arm's reach of a mechanical means of closure of the internal self-closing stop valve at all times the internal self-closing stop valve is open; except, that person may be away from the mechanical means only for the short duration necessary to engage or disengage the motor vehicle power take-off or other mechanical, electrical, or hydraulic means used to energize the pump and other components of the cargo tank motor vehicle's discharge system; or

(C) A fully operational remote-controlled system capable of stopping the transfer of lading by operation of a transmitter carried by a qualified person attending unloading of the cargo tank motor vehicle. Where the means for closure of the internal self-closing stop valve includes a remote-controlled system, the attendance requirements of § 177.834(i)(3) of this subchapter are satisfied when a qualified person:

(1) Is carrying a radio transmitter that can activate the closure of the internal self-closing stop valve;

(2) Remains within the operating range of the transmitter; and

(3) Is awake throughout the unloading process, and has an unobstructed view of the cargo tank at all times that the internal self-closing stop valve is open.

49 C.F.R. § 171.5(a)(1)(iii).

RSPA intended *inter alia* that the Final Rule mandate compliance with one of three operational controls to compensate for the inability of passive emergency discharge control systems to function as required by the HMR. In this way the regulation would maintain safety while industry and government worked to develop a system that effectively stopped hazardous material discharges from cargo tanks upon the failure of a transfer hose or piping. RSPA concluded that the newly-mandated controls were necessary because a substantial portion of the industry had failed to comply with an important excess flow

requirement in place since 1941, and to comply with the IFR.

### D

In adopting the Final Rule, RSPA addressed some of the comments submitted in response to the IFR. Regarding barriers to compliance, several commenters noted that a single operator making a retail propane delivery could not remain within arm's reach of the means for closing the internal self-closing stop valve because he would be located most frequently at the delivery end of the hose, which could be 100 feet or more from the vehicle. The Attendance Regulation requires, in relevant part:

> (2) Unloading. A motor carrier who transports hazardous materials by a cargo tank must ensure that the cargo tank is attended by a qualified person at all times during unloading[.]

> (3) A person "attends" the loading or unloading of a cargo tank if, throughout the process, he is awake and has an unobstructed view of the cargo tank, and is within 7.62 meters (25 feet) of the cargo tank.

> &ast; &ast; &ast; &ast; &ast; &ast;

> (5) A delivery hose, when attached to the cargo tank, is considered part of the vehicle.

49 C.F.R. § 177.834(i). The commenters assumed that because § 177.834(i)(5) provides that the delivery hose, when attached to the cargo tank, is considered part of the vehicle, an operator is in compliance with the Attendance Regulation when standing within 25 feet of the hose.

In response, RSPA rejected a fundamental premise of the comments—that an operator could comply with the Attendance Regulation by remaining within 25 feet of the delivery hose rather than within 25 feet of the cargo tank. RSPA stated:

> RSPA rejects the industry's interpretation of the long-standing operator attendance rules in § 177.834(i)(3) that a single operator satisfies requirements for an unobstructed view of the cargo tank, and is within 25 feet of the cargo tank, merely by being in proximity to, and having an unobstructed view of, any part of the delivery hose, which may be 100 feet or more away from the cargo tank motor vehicle, during the unloading (transfer) operation. The rule clearly requires an operator be in a position from which the earliest signs of problems that may occur during the unloading operation are readily detectable, thereby permitting an operator to promptly take corrective measures, including moving the cargo tank, actuating the remote means of automatic closure of the internal self-closing stop valve, or other action as appropriate. RSPA contends the rule requires that an operator always be within 25 feet of the cargo tank. Simply being within 25 feet of any one of the cargo tank motor vehicle's appurtenances or auxiliary equipment does not constitute compliance.

62 Fed.Reg. 44038, 44044.

### II

Following RSPA's adoption of the Final Rule and its rejection of the industry's interpretation of the Attendance Regulation, plaintiffs NPGA, Northwest Butane Gas Co., and Huffhines Gas, Inc. sued DOT and RSPA, seeking a preliminary injunction against enforcement of the Final Rule and defendants' interpretation of the Attendance Regulation. The court consolidated plaintiffs' motion for a preliminary injunction with adjudication of the merits, pursuant to Fed.R.Civ.P. 65(a)(2). The parties then filed cross-motions for summary judgment.[7]

---

7. Plaintiffs object to, and move to strike, parts of the administrative record, contending that RSPA created some materials after it promulgated the Final Rule and that materials were unavailable for public comment during the rulemaking. *See* P. Opposition Mem. at 7–9; P. Mot. to Strike. Because the court has not relied on any of the challenged materials in deciding this case, the court overrules the

Plaintiffs ask the court to declare that the three alternatives for complying with the Final Rule are arbitrary and capricious and were promulgated in violation of the APA and the RFA. Plaintiffs also seek a declaration that defendants improperly changed the regulatory requirements of the Attendance Regulation through an interpretation, without rulemaking procedures required by the APA. They maintain that the change is arbitrary and capricious and inconsistent with the plain meaning, defendants' longstanding interpretation, and industry's understanding and application of the Attendance Regulation. Plaintiffs seek a permanent injunction staying the effectiveness of, and enjoining defendants from enforcing, the Final Rule and defendants' interpretation of the Attendance Regulation.[8]

## III

The court must first address whether this case presents an Article III case or controversy.

### A

■ On November 20, 1998, after the court heard oral argument, the parties by joint notice advised the court of Congress' passage on October 21, 1998 of § 324 of the Department of Transportation and Related Agencies Appropriations Act, 1999, Pub.L. No. 105–277, 112 Stat. 2681 (the "Appropriations Act"), which provides:

None of the funds made available in this Act may be used for the purpose of promulgation or enforcing any regulation that has the practical effect of (a) requiring more than one attendant during unloading of liquefied compressed gases, or (b) preventing the attendant from monitoring the customer's liquefied

compressed gas storage tank during unloading.

Section § 324 appeared effectively to prevent enforcement of the Final Rule and the Attendance Regulation by prohibiting RSPA's use of appropriated funds to enforce regulations that have the practical effect of requiring more than one attendant or of preventing the attendant from monitoring the customer's tank. The court therefore raised *sua sponte* the question whether an Article III controversy existed and directed that the parties brief the issue. *See American Trucking Ass'ns v. ICC*, 747 F.2d 787, 790 (D.C.Cir.1984) (holding that court may raise ripeness doctrine on its own). Although both sides have submitted briefs in which they contend that the case is ripe and that the court has Article III jurisdiction, this does not effectively pretermit the court's inquiry. *See Buchner v. FDIC*, 981 F.2d 816, 818 (5th Cir.1993) (noting that parties cannot confer subject matter jurisdiction by agreement).

### B

■ The ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *see also American Trucking*, 747 F.2d at 789–90 (stating that

---

objections and denies the motion to strike as moot.

8. Prior to oral argument of the summary judgment motions, plaintiffs filed a motion to stay the proceedings due to a pending negotiated rulemaking. The court ruled that the motion would be considered at oral argument and carried with the court's decision on the

summary judgment motions. The parties have not as yet advised the court that the negotiated rulemaking is likely to resolve all the issues now in dispute, and plaintiffs have expressed their preference that the court resolve this case as expeditiously as possible. The court therefore denies the motion to stay.

avoiding entanglement in abstract disagreements serves function not merely of protecting agency, but of protecting court from adjudicating matters that are not sufficiently fleshed out, make no difference, and waste judicial resources). The ripeness determination generally requires that the court evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott,* 387 U.S. at 149, 87 S.Ct. 1507. This involves considering whether (1) the issues presented are purely legal; (2) the agency's pronouncement is a "final agency action" within the meaning of 5 U.S.C. §§ 551(13) and 704; (3) the impact on the petitioners is direct and immediate; and (4) resolution of the issues will foster effective administration of the statute. *Merchants Fast Motor Lines, Inc. v. ICC,* 5 F.3d 911, 920 (5th Cir.1993) (citing *Abbott,* 387 U.S. at 149–154, 87 S.Ct. 1507).

### C

#### 1

■ The court holds that the present case satisfies the first ripeness element because it presents purely legal issues, the resolution of which would foster effective administration of the regulations at issue. *See id.*

#### 2

■ The second factor—whether the challenged regulations are final agency actions—is more questionable. "The Supreme Court has identified four factors for determining when agency action is final: (1) whether the challenged action is a definitive statement of the agency's position, (2) whether the action has the status of law with penalties for noncompliance, (3) whether the impact on the plaintiff is direct and immediate, and (4) whether the agency expects immediate compliance." *Dunn–McCampbell Royalty Interest, Inc. v. National Park Svc.,* 112 F.3d 1283, 1288 (5th Cir.1997) (citing *Abbott,* 387 U.S. at 149–153, 87 S.Ct. 1507). The challenged regulations are definitive statements of defendants' position and have the status of law. Absent funding for enforcement, and considering the fact that the Final Rule is scheduled to expire before termination of the Appropriations Act, however, the regulations superficially appear to lack penalties for noncompliance, direct and immediate impact on plaintiffs, and an agency expectation of immediate compliance. Despite this, the record reflects that the challenged regulations could support the imposition of penalties for regulatory violations, defendants expect and intend immediate compliance, the regulations have a direct and immediate impact on the day-to-day affairs of plaintiffs, and plaintiffs will suffer hardship if the court withholds consideration of the controversy.

Because § 324 of the Appropriations Act does not revoke or suspend the applicability of the Final Rule or of defendants' interpretation of the Attendance Regulation, violators of the regulations may be subject to future penalties. The substantive standards set out in the challenged regulations remain effective, regardless whether enforcement actions can now be undertaken. *See Donovan v. Carolina Stalite Co.,* 734 F.2d 1547, 1558 (D.C.Cir. 1984) (holding that mine operators subject to Act remained under same substantive legal obligations, implementing standards and regulations promulgated under Act remained in force, and statutory basis for enforcement litigation remained in effect, despite Congress' refusal to appropriate funding for enforcement). If Congress does not reinstate the funding ban for the coming fiscal year, affected industries must comply with the substantive standards of the regulations to avoid possible enforcement actions. Section 324 does not prevent enforcement during fiscal year 2000 for violations committed during fiscal year 1999. The challenged regulations have the status of law and carry penalties for noncompliance.

Defendants expect immediate compliance with the regulations. *See, e.g.,* 62 Fed.Reg. 65188, 65190. Moreover, in promulgating the Final Rule, RSPA found that a "serious threat to the public safety continues to exist and must be addressed without further delay" and that "good cause exists for making this rule immediately effective." *Id.* at 44046. The challenged regulations therefore constitute "final" agency actions for purposes of the court's ripeness analysis. *See Dunn–McCampbell,* 112 F.3d at 1288.

### 3

The third factor addresses whether the impact on plaintiffs is direct and immediate. The expectation of immediate compliance with the regulations and the potential for enforcement of current violations during the next fiscal year create a direct and immediate impact on plaintiffs. The Final Rule establishes standards of conduct by which plaintiffs must deliver and unload propane gas. Compliance with these requirements will also obligate plaintiffs to adjust their conduct immediately. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 891–92, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). These adjustments in plaintiffs' operations and equipment will affect their daily affairs and alter their primary conduct. *See Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). Plaintiffs' efforts to adhere to the Final Rule and the Attendance Regulation will impact them concretely. *See Merchants,* 5 F.3d at 920.

### 4

The court examines fourth whether resolution of the issues will foster effective administration of the regulations. Given the nature of the regulations and of the challenges made to them, the court's decision unquestionably will foster their effective administration.

### IV

Having determined that plaintiffs' lawsuit presents ripe questions and properly invokes this court's Article III jurisdiction, the court now turns to the merits.

Plaintiffs challenge the Final Rule on the grounds that the three alternatives for compliance are arbitrary and capricious and were promulgated in violation of both the APA and the RFA. They assert that the Final Rule is arbitrary and capricious because (1) it is based on RSPA's misunderstanding of the problem and misuse of incident and accident data, (2) immediate compliance is neither feasible nor practicable, and (3) RSPA failed to analyze critical safety and cost issues.

### A

■ The court may invoke the APA to set aside agency action only if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is accorded a "presumption of regularity." *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The court may not substitute its judgment for that of the agency. *Id.* (citing *id.*). When an agency is charged with the duty of examining the relevant data and articulating a satisfactory explanation for its action, including a rational connection between the facts found and the choice made, judicial review of the agency's decision consists of determining whether it was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* An administrative rule or regulation is arbitrary and capricious when the agency has relied on factors that Congress did not intend that it consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that either runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "[T]he essential function of judicial review, in this context, is to ensure that the agency engaged in 'reasoned decisionmaking.'" *Id.* (citations omitted).

 "[T]he agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *State of La. v. Verity*, 853 F.2d 322, 327 (5th Cir.1988). If an agency's action is to be upheld, it must be sustained on the basis articulated by the agency itself. *Garner*, 767 F.2d at 116–17. Although a court may not provide a reasoned basis for administrative agency action that the agency itself has not given, it will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned. *Id.* at 118. The court must uphold an agency's action where it has "articulate[d] a satisfactory explanation for its action." *International Ladies' Garment Workers' Union v. Dole*, 729 F.Supp. 877, 886 (D.D.C.1989) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856). The court will also decline to rely on *post hoc* explanations when engaging in substantive review of an administrative decision. *Garner*, 767 F.2d at 117.

### B

As a threshold matter, the court has difficulty concluding that plaintiffs can validly challenge an agency rule that, as one alternative, permits them to satisfy its requirements simply by complying with HMR that have been in effect in some form since 1941 and have stood unchallenged (if widely disregarded). RSPA adopted the Final Rule as an alternative to existing requirements, and stated expressly that "[i]ndustry may choose to comply with the requirements in § 178.337–11, tracing back to 1941, or with provisions in [the Final Rule]." 62 Fed.Reg. 44038, 44046. The court need not rest its decision on this basis, however, because the Final Rule otherwise withstands an APA challenge.

 Plaintiffs contend that defendants misunderstood the problem and failed to demonstrate a need for the Final Rule's burdensome requirements, based the Final Rule on erroneous facts that were either unsupported or were directly contradicted by evidence before RSPA, and justified the Rule based on unrelated propane incidents and conclusory statements rather than upon reasoned analysis. Plaintiffs identify what they contend are five erroneous facts that defendants relied upon in promulgating the Final Rule. The court concludes that plaintiffs' arguments are either incorrect or immaterial. The court also holds that, even without relying on these facts, defendants have demonstrated reasoned decisionmaking and a rational basis for the Final Rule.

Plaintiffs argue that because defendants' statutory authority is limited to providing an adequate rather than absolute level of protection, RSPA exceeded its authority in promulgating the Final Rule. The court disagrees. There is nothing in the rulemaking record or plaintiffs' briefs that indicates that RSPA intended that the Final Rule achieve absolute protection. Moreover, the Secretary and RSPA have broad authority in promulgating regulations regarding safety in the transportation of hazardous materials. Congress enacted the federal hazardous material transportation law to "provide adequate protection against the risks to life and property inherent in the transportation of hazardous material in commerce by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 5101. The Secretary has considerable authority and discretion to "prescribe regulations for the safe transportation of hazardous material in intrastate, interstate, and foreign commerce." *Id.* § 5103(b). The court will not substitute its judgment for that of the agency, especially "when the agency is called upon to weigh the costs and benefits of alternative

policies, since '[s]uch cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency[.]' " *Center for Auto Safety v. Peck,* 751 F.2d 1336, 1342 (D.C.Cir.1985) (quoting *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1440 (D.C.Cir.1983)); *see also Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (indicating that deference is "all the more warranted" with respect to highly technical and complex regulatory program that requires significant expertise and entails the exercise of judgment grounded in policy concerns); *City of Aurora v. Hunt,* 749 F.2d 1457, 1462–64 (10th Cir.1984) (refusing to substitute judgment for that of FAA because "it lack[ed] the expertise necessary to assess whether the proposed procedure is in fact safe"), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970, 971 (10th Cir.1992) (en banc). RSPA promulgated the regulation within its authority. The court will defer to RSPA's expertise.

Plaintiffs' argument that no rational basis exists for the Final Rule essentially asks the court to replace RSPA's judgment that the Final Rule ensures safe transportation of hazardous materials with plaintiffs' assessment that the risk of discharge is too small to justify the challenged safety procedures. The court explains below that a rational basis exists for the Final Rule. Accordingly, the court will not substitute its judgment for the agency's and will defer to RSPA's expertise regarding safety. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (noting that reviewing court must be most deferential when examining scientific determinations within agency's special expertise, as opposed to simple findings of facts); *see also Center for Auto Safety,* 751 F.2d at 1342 (stating that cost-benefit analyses are most appropriately entrusted to agency expertise).

RSPA promulgated the Final Rule as an alternative to the widely-disregarded emergency discharge control systems requirements. It adopted the regulation after the Sanford incident, in which the emergency discharge control system failed to function, prompting an industry revelation of widespread noncompliance with applicable safety requirements. Even plaintiff NPGA acknowledged the severity of the rampant noncompliance by applying for an emergency exemption from the requirements of § 177.337–11(a). *See* 62 Fed.Reg. 44038, 44046.

RSPA rationally based its rulemaking on evidence that (1) there was widespread noncompliance with emergency discharge control systems requirements due to nonfunctioning excess flow valves intended to control the unintentional releases of liquefied propane gas, and (2) release of propane into the environment is extremely hazardous to public safety due to its flammable and explosive character. *See* 62 Fed.Reg. 44038. Rather than require strict compliance with § 177.337–11(a), RSPA provided rational options that at once allowed the industry flexibility and ensured public safety in the transportation of hazardous materials. *See* 62 Fed.Reg. 44038, 44042 ("The finding by RSPA that an economic and safety emergency exists led the agency to issue the IFR in order to provide industry with an immediate means of compliance with the HMR, thereby avoiding an interruption of service and the resulting economic and safety impacts described by the petitioners.").

Arguing that five decades have elapsed without serious incidents involving excess flow valves, plaintiffs maintain that more than the Sanford incident is needed to justify the Final Rule. The court disagrees. RSPA did not promulgate this regulation solely as a precipitous reaction to one accident. The administrative record reflects that the agency acted in thoughtful response to widespread industry noncompliance, revealed as a result of investigative and other agency activities that followed

the Sanford incident. *See* 62 Fed.Reg. 44038. Industry disregard for the HMR, coupled with the potential for extremely dangerous propane discharges, warranted the Final Rule. *See* 62 Fed.Reg. 44038, 44039 ("Most of these incidents were the result of collisions rather than due to unintended release of lading during transfer operations. However, each incident establishes the potential for grave consequences[.]"). RSPA need not show additional accidents, deaths, or injuries from widespread noncompliance with emergency discharge control systems requirements. The Final Rule is "a reasonable precaution against the occurrence of a feared harm." *American Fed'n of Gov't Employees v. Skinner*, 885 F.2d 884, 891–92 (D.C.Cir. 1989) (upholding drug testing for airline mechanics, and observing that single incident of drug use could have "irreversible and calamitous consequences" and that "public should not bear the risk" that hazardous materials inspector may be impaired). RSPA promulgated the Final Rule to enhance safety and mitigate the chances of a catastrophic event caused by a propane release.

Contrary to plaintiffs' assertions, RSPA understood the problem, demonstrated the need for the Final Rule, and relied on valid information in promulgating it. The Final Rule complied with RSPA's statutory authority to ensure public safety, and was the product of reasoned decisionmaking. *See Garner*, 767 F.2d at 116.

## C

Citing congressional testimony of RSPA's administrator,[9] plaintiffs argue that the Final Rule is arbitrary and capricious and violates the APA because defendants knew, on the effective date of the Final Rule or reasonably thereafter, that none of the three alternative methods of compliance was feasible. The court disagrees. It is clear from the rulemaking

record that defendants had concluded that at least two of the three alternatives were available on the date the Final Rule became effective.

### 1

Plaintiffs challenge the method of compliance that involves use of properly functioning emergency discharge control systems, as required by § 178.337–11(a)(1)(i). Citing 61 Fed.Reg. 65480 and 62 Fed.Reg. 7638, plaintiffs assert that RSPA has acknowledged that this alternative cannot be achieved with current technology and is therefore illusory.

RSPA promulgated § 171.5(a)(1)(iii) in response to widespread noncompliance with § 178.337–11(a)(1)(i), which requires functioning emergency discharge control systems. The first alternative in § 171.5(a)(i)(iii) simply affords plaintiffs an option to demonstrate compliance by using an emergency discharge control system that satisfies § 178.337–11(a)(1)(i). RSPA found that the problem with the emergency discharge control systems affects only segments of, rather than the entire, industry. *See* 62 Fed.Reg. 44038, 44046. RSPA also received testimony that the original emergency discharge control systems requirements ensure an acceptable level of public safety. AR 999–1000 ("excess flow systems [on bobtails] work very reliably"); AR 1018–1019 ("excess flow valves ... have been very effective").[10]

RSPA stated only that it "is not aware of readily available, off-the-shelf equipment that can provide a functioning automatic excess flow feature on cargo tanks *without removal of pumps and other restrictions.*" 62 Fed.Reg. 7638, 7644 (emphasis added). Thus members of industry could comply with this alternative by removing pumps and compensating for decreased discharge flow by enlarging piping and increasing pressure in the vapor space

9. P. Support Mem. Ex. 6 at 21 ("[W]e recognize there is a [period of] time that is needed to comply.").

10. Citations to "AR" are to the administrative record.

of the cargo tank, or by relocating pumps to the receiving end of the unloading system. *See* 62 Fed.Reg. 7638, 7643. The record adequately reflects that regulated entities are currently capable of meeting the first alternative, it allows for additional future compliance, and it is feasible. The rule is not arbitrary and capricious.

2

Plaintiffs argue that the second means for compliance is infeasible because it requires a second attendant on all bobtail delivery vehicles, at a prohibitive cost.[11] This alternative requires that an attendant remain within arm's reach of a mechanical means of closure of the internal self-closing stop valve at all times when the valve is open. 49 C.F.R. § 171.5(a)(1)(iii)(B). Because RSPA found that this alternative is currently available, feasible, and achievable without a second attendant, plaintiffs' arguments lack force.

RSPA has determined that this compliance option can be satisfied by one attendant. *See, e.g.*, 62 Fed.Reg. 44038, 44045 ("RSPA believes this final rule clearly provides motor carriers with the ability for a single operator to safely unload liquefied compressed gasses transported in specification MC 330 and MC 331 cargo tank motor vehicles in most circumstances and at a minimal cost[.]"). For example, an attendant is free to check the level of propane at the customer tank or conduct other unloading operations by closing the internal valve. This option only requires that the attendant be within arm's reach of the internal self-closing valve only when the valve is open. 49 C.F.R. § 171.5(a)(1)(iii)(B). Operators can use instrumentation at the customer's storage tank that transmits a reading from the storage tank to the cargo tank, permitting the operator to remain close to the internal stop valve. *See* 62 Fed.Reg. 7638, 7643. When RSPA acknowledged that the two-person attendance requirement would be

too costly to be feasible, it "assessed the NPGA's suggested use of a lanyard" and concluded that "the lanyard system and equally efficient means of achieving compliance with the IFR were determined by RSPA to be among the common-sense approaches that could be taken by industry to permit its continued operation of the non-conforming cargo tank motor vehicles." 62 Fed.Reg. 44038, 44043. The administrative record adequately supports the conclusion that operators can employ this alternative currently, without prohibitive cost, by using one attendant.

3

Plaintiffs maintain that the third method for compliance requires the immediate availability of remote control devices that were neither tested nor available on the date RSPA adopted the Final Rule. Defendants respond that "RSPA made an expert and reasoned judgment that viable technological options could be adapted and implemented within a reasonable period of time." D. Support Mem. at 18. Defendants cite several record references for the proposition that remote control devices are currently under development and that some have been tested in the industry. Because the first two alternatives are feasible, currently available, and not arbitrary and capricious, and because the rule permits compliance by satisfying only one alternative, the Final Rule is not arbitrary and capricious by reason of the third option.

D

Plaintiffs argue that the Final Rule is arbitrary and capricious because defendants failed to analyze certain critical safety and cost issues. They posit that the regulation neglects the importance of having an attendant stationed at the customer tank. Plaintiffs assert that an operator monitoring the customer's tank and pre-

---

**11.** *See* 62 Fed.Reg. 44038, 44043 ("the cost estimate [of $237 million] [was] so great as to effectively eliminate the two-person method of compliance from consideration as a feasible alternative.").

venting overfill is in a better position to ensure a safe unloading operation.

Nothing in the administrative record establishes that attendance at the customer's tank is more important than attendance at the cargo tank. Further, the record does not demonstrate that it is safe to leave the cargo tank unattended. The court will not substitute its judgment for that of the agency, especially regarding safety of hazardous materials, a matter outside the court's expertise. *See, e.g., Baltimore Gas,* 462 U.S. at 105, 103 S.Ct. 2246; *Center for Auto Safety,* 751 F.2d at 1342.

### E

Plaintiffs also attack the Final Rule as arbitrary and capricious based on the enormous cost that they contend will be added to many propane deliveries by the requirement of a second attendant. The court has already held above that a second attendant is not required on many propane deliveries. For example, a single attendant may use a lanyard that would enable him to comply with the Final Rule and also remain near most customers' tanks. A single attendant can attend a customer's tank when the internal self-closing stop valve is in a closed position. *See* 49 C.F.R. § 171.5(a)(1)(iii)(B). Simply complying with § 178.337–11(a)(1)(i) will allow a single attendant to effect most propane deliveries, subject to the Attendance Regulation. *See* 49 C.F.R. § 171.5(a)(1)(iii)(A). The court rejects this contention.

### V

Plaintiffs also challenge the Final Rule on the ground that defendants promulgated it in violation of the RFA, which directs that agencies consider the potential economic impact of regulatory action on small business and other small entities.

The RFA requires that a final rule be accompanied by a final regulatory flexibility analysis, consisting of a statement of the need for the rule, a summary of public comments received on regulatory flexibility issues and agency responses to them, a description and estimate of the number of small entities to which the rule will apply, a description of reporting requirements of the rule, a description of alternatives to the rule consistent with the regulatory statutes but imposing less economic burden on small entities, and a statement of why such alternatives were not chosen. 5 U.S.C. § 604(a).[12]

Defendants adequately provided a succinct statement of the need for, and objectives of, the rule by explaining that they were safety related. *See* 5 U.S.C. § 604(a)(1).[13] Defendants also satisfied 5

---

**12.** Defendants posit that they are not subject to the RFA because it applies only to the rules for which an agency is required to publish a notice of proposed rulemaking pursuant to § 553 of the APA. They maintain that § 553 did not require a notice of proposed rulemaking due to the emergency nature of the rule. The court need not address defendants' arguments because the court concludes that defendants satisfied the requirements of the RFA by their Final Regulatory Evaluation under Executive Order 12866, AR 787–812, and their summary of such analysis in the *Federal Register,* 62 Fed.Reg. 44038. *See* 5 U.S.C. § 605(a) ("Any Federal agency may perform the analyses required by [the RFA] in conjunction with or as a part of any other agenda or analysis required by any other law if such other analysis satisfies the provisions of such sections.").

**13.** Defendants stated:

After evaluating the situation [regarding the failure of the excess flow feature of the emergency discharge control systems] ..., RSPA found that the situation does constitute an emergency with broad applicability to many persons and far reaching safety and economic impacts.

\* \* \* \* \* \*

[I]t became evident that the level of safety called for in the [Hazardous Materials Regulations] is not being achieved by emergency discharge control equipment designed, tested, produced, and certified by and for manufacturers and assemblers of these cargo tank motor vehicles. Specifically, these tanks do not meet the requirement for automatic closure of internal self-closing stop valves and excess flow valves in the event of separation of hoses or piping. The requirements of § 178.337–11 are intended to ensure an essential level of safety in event of an emergency during unloading operations.

U.S.C. § 604(a)(2). RSPA made a preliminary regulatory evaluation available in the public docket, *see* 62 Fed.Reg. 7638, 7646, and published the IFR for public comment, *id.* at 7647–48. RSPA summarized these comments in the *Federal Register. See id.* at 44042–45. Many comments focused on the economic impact of the regulation. *See, e.g., id.* at 44043 ("The $660 million estimate of annual costs calculated by NPGA results from a misreading of the rule."); *id.* ("Numerous comments submitted by small propane dealers ... cited an estimate of approximately $2,500 per vehicle to replace non-performing (defective) emergency discharge control systems[.]"). Additionally, RSPA summarized its assessment of the issues raised by public comment. *See, e.g., id.* (indicating that when RSPA recognized that cost estimate of requiring two operators was "so great as to effectively eliminate the two-person method of compliance from consideration as a feasible alternative," it then considered use of lanyard that resulted in significantly lower costs); *id.* (recognizing that threats to life and property warrant compliance with reasonably achievable performance standard); *id.* at 44048 ("[G]iven the importance of small business in liquefied petroleum gas distribution, ... RSPA believes that it would not be possible to establish differing standards [for small businesses] and still accomplish the objectives of the Federal hazardous materials transportation law[.]"). RSPA also identified changes made in the proposed rule as a result of such comments. *See, e.g., id.* at 44044 (responding to industry concerns by allowing operator to be away from shut-off controls for brief period to conduct other activities, thereby alleviating cost of second attendant); *id.* at 44045 ("Specifically, as requested by the joint petitioners, this final rule authorizes the person attending

the unloading of a cargo tank motor vehicle to step away from the mechanical means of closure of the internal self-closing stop valve for the short duration necessary to engage or disengage the motor vehicle power take-off or other ... means used to energize the pump[.]"). Defendants satisfied each requirement of 5 U.S.C. § 604(a)(2).

In compliance with 5 U.S.C. § 604(a)(3), defendants also described and provided an estimate of the number of small entities to which the rule would apply. RSPA noted that more than 95% of retail liquefied petroleum gas dealers, and greater than 95% of merchant wholesalers of liquefied petroleum gas, must be considered small businesses for purposes of the RFA. 62 Fed. Reg. 44038, 44048. Based on 1992 census data, RSPA identified 2,634 retailers and 409 merchant wholesalers. AR 800.[14]

RSPA satisfied 5 U.S.C. § 604(a)(4). In addition to general compliance with the regulation as described in 62 Fed.Reg. 44038, 44045–46, the Final Rule requires only one "reporting, recordkeeping and other compliance requirement[ ]," which applies to all classes of entities subject to the regulation. *See* 5 U.S.C. § 604(a)(4). The employer shall "ensure that a record of the training is created, certified, and maintained as specified in § 172.704(d) of this subchapter." 49 C.F.R. § 171.5(a)(1)(vi). "As a general provision, this requirement already exists" under § 172.704(d). 62 Fed.Reg. 44038, 44046. As such, the Final Rule adds no new reporting or recordkeeping requirements.

Finally, defendants described the steps they took to minimize significant economic impact on small entities, consistent with the stated objectives of applicable statutes. *See* 5 U.S.C. § 604(a)(5). RSPA chose the

---

AR 789–90; *see also* 62 Fed.Reg. 44038 ("[Section 171.5] requires motor carriers to comply with additional operational controls intended to compensate for the inability of passive emergency discharge control systems to function as required by the Hazardous Materials Regulations. The interim operational

controls specified in this rule will improve safety[.]").

**14.** NPGA's application for emergency exemption noted greater than 3,200 dealers in their membership.

Final Rule from three alternatives—doing nothing, temporarily withdrawing the requirement for passive emergency discharge control systems until a technical solution to the problem is developed, or adopting the requirements encompassed in the Final Rule. AR 793–95. RSPA rejected the first alternative because it "believe[d] that to take no action in the face of demonstrated inadequacy of current excess flow valve installations on liquefied compressed gas cargo tank motor vehicles [was] not a viable alternative in that in the immediate future it would expose the public to unacceptable risks of injury and property damage during unloading of these vehicles." *Id.* at 793. It rejected the second alternative because "[t]o withdraw the current requirement without providing an alternate means of assuring product containment would be irresponsible and contrary to the statutory mandate [to prescribe regulations for the safe transportation of hazardous materials]." *Id.* at 794. The third alternative was the only option that permitted "RSPA to meet its statutory mandate to prescribe regulations for the safe transportation of hazardous materials in commerce." *Id.* at 795. RSPA evaluated the alternatives and selected the only course of action that enabled it to satisfy the statutory mandate. This option impacts small businesses to the same degree as larger ones. 62 Fed.Reg. 44038, 44048 ("[G]iven the importance of small business in liquefied petroleum gas distribution ... RSPA believes that it would not be possible to establish differing standards [for small businesses] and still accomplish the objectives of the Federal hazardous materials transportation law[.]"). As discussed above, the dangerous characteristics of liquefied petroleum gas warrant RSPA's taking reasonable action to ensure safety in transporting it.

To require another evaluation would be duplicative and contrary to the express language of the RFA. *See* 5 U.S.C. § 605(a); *Associated Fisheries of Maine,*

*Inc. v. Daley,* 127 F.3d 104, 115 (1st Cir. 1997). "[A]n agency can satisfy section 604 as long as it compiles a meaningful, easily understood analysis that covers each requisite component dictated by the statute and makes the end product—whatever form it reasonably may take—readily available to the public." RSPA complied with the RFA.

## VI

The court now turns to plaintiffs' challenge to the Attendance Regulation. Plaintiffs complain that defendants violated the APA by changing the requirements of this regulation. They maintain that the plain language of § 177.834(i)(5) conflicts with defendants' interpretation, and assert that the construction is contrary to the Attendance Regulation's regulatory history. They also posit that the interpretation is inconsistent with the definition of "cargo tank" in § 171.8. In essence, they contend that for almost 50 years, bobtail operators have been in compliance with the Attendance Regulation by remaining within 25 feet, and maintaining an unobstructed view, of the delivery hose when the delivery hose was attached to the cargo tank vehicle. *See, e.g.,* P. Opposition Mem. Ex. 6 at 1 ("If the delivery hose, which is considered part of the vehicle, is 25 feet or longer, the attendant can be a distance of at least 50 feet from the controls."). They argue that RSPA essentially promulgated a new rule when it rejected industry's interpretation in the preamble to the Final Rule.

The court rejects plaintiffs' contentions. The preamble to the Final Rule follows the clear language of the Attendance Regulation. The attendant must have an unobstructed view, and be within 25 feet, of the cargo tank. The Attendance Regulation makes clear that the delivery hose is not part of the cargo tank. "A delivery hose, when attached to the *cargo tank,* is considered part of the *vehicle,*" not part of the

cargo tank itself.[15] 49 C.F.R. § 177.834(i)(5) (emphasis added).[16]

The history and purpose of the regulation are consistent with its plain language. RSPA's predecessor promulgated the current version of the Attendance Regulation after it "found that several dangerous incidents have occurred during the loading or unloading of tank motor vehicles which could have been avoided if there had been someone near the cargo tank to take corrective or precautionary action." 38 Fed. Reg. 22900, 22902–03 (1973). The internal self-closing stop valve located on the cargo tank provides the means for halting product flow. See, e.g., 62 Fed.Reg. 7638, 7643. The regulation intended a solution that would involve attendance near the cargo tank, not the delivery hose, so that the flow of product could be halted.

Recently, RSPA has similarly interpreted the regulation. See, e.g., 62 Fed.Reg. 65188, 65191 ("[t]he type of precautionary action the [predecessor to RSPA] contemplated when it initiated [the rulemaking for the Attendance Regulation] cannot be taken if a cargo tank attendant is more than 25 feet away from the cargo tank, out of sight behind a building or other obstruction, or both."); 55 Fed.Reg. 6758, 6759 (1990) (noting that purpose of attendance requirement is to "ensure that hazardous materials are safely loaded or unloaded and that in the event of an emergency, such processes are rapidly halted."); AR 997 (RSPA commented that the attendance requirement requires attendance within 25 feet of the cargo tank and an unobstructed view).

Defendants have held the same view of the Attendance Requirement for many years. See AR 200 (testimony of RSPA representative noting that requirement is a "longstanding requirement" that has "been on the books for quite awhile"). The preamble merely reiterates the purpose of the Attendance Regulation and is consistent with the rule's plain language and past interpretations.

Plaintiffs assert that defendants inspected bobtail vehicles for decades, knowing that single operators would attend a delivery of propane at the customer's tank, a distance potentially greater than 100 feet from the cargo tank motor vehicle. They have produced no competent record evidence on this point, especially concerning defendants' knowledge. Moreover, RSPA explicitly stated that it was unaware that industry members operated in this manner. 62 Fed.Reg. 65188, 65192 ("[N]either FHWA nor RSPA inspectors routinely in-

**15.** Plaintiffs maintain that defendants erred when revising the regulation in the 1970's, see 39 Fed.Reg. 41741, 41742 (1974), by not changing "vehicle" to "cargo tank" in 49 C.F.R. § 177.834(i)(5). P. Support Mem. at 20 n. 6. They have neither adduced proof nor made a compelling argument that such an error was committed in the revision process.

**16.** "Cargo tank" is defined to include "appurtenances, reinforcements, fittings, and closures." 49 C.F.R. § 171.8 (1997). "Appurtenance," as applied in §§ 178.345, 178.346, 178.347, and 178.348, "means any cargo tank accessory attachment that has no lading retention or containment function and provide no structural support to the cargo tank." 49 C.F.R. § 178.345–1(c)(1997). Because of the narrow application of this definition, it is of little help. Plaintiffs assert that the following statement flatly contradicts RSPA's argument that a hose cannot be an appurtenance and part of the cargo tank:

> Technically, hoses attached to piping and under pressure during transit form a part of the cargo tank wall as defined in § 178.320(a)(1). This means that they should be tested in accordance with § 180.407(g) at the test pressure required for MC 330/331 cargo tanks[.]

62 Fed.Reg. 7638, 7644. This RSPA statement provides little assistance because § 178.320(a) has a narrow application, as demonstrated by its opening text. 49 C.F.R. § 178.320 (1997) ("for purposes of this subpart"). The referenced subpart includes only §§ 178.315–178.348. The cramped application of the definition of appurtenance, and RSPA's comments, shed no light on whether a hose is part of a cargo tank for purposes of § 177.834(i). The court turns to the plain language and history of the regulation and concludes the hose is "considered a part of the vehicle," not the cargo tank. See 49 C.F.R. § 177834(i)(5).

spect small CTMV unloading operations. Thus, [DOT] was not aware that small [cargo tank motor vehicle] deliveries of propane were being made in violation of the HMR."); *see also* AR 996–97 (comment of director of Office of Hazardous Materials Technology suggesting concern that the rulemaking process was revealing industry practice deviating from the 25–foot, unobstructed view requirement).

Because defendants did not effectively promulgate a new regulation or alter their interpretation or the meaning of an old one, the APA is inapplicable. *See* 5 U.S.C. § 553.[17]

\*　　\*　　\*　　\*　　\*　　\*

The court grants defendants' motion for summary judgment and denies plaintiffs' motion. The court will file a judgment in favor of defendants.

**SO ORDERED.**

---

**17.** To the extent that plaintiffs challenge the attendance regulation promulgated in 1974, it is untimely. See 28 U.S.C. § 2401 (providing that action against United States, must be brought within six years after right of action first accrues); *Dunn–McCampbell*, 112 F.3d at 1287 (indicating that limitations period is six years from date agency published regulation in *Federal Register*). The agency merely reaffirmed its prior position in the preamble. This did not create an opportunity for review. *See Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C.Cir.1996) ("[W]hen the agency merely responds to an unsolicited comment by reaffirming its prior position, that response does not create a new opportunity for review.").